*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0002P (6th Cir.)
File Name:  00a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee/*
*Cross-Appellant (99-1003),*

*v.*

JACK WILLIAM TOCCO,
*Defendant-Appellant*
*(98-2312/2426)/*
*Cross-Appellee.*

Nos. 98-2312/
2426; 99-1003

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80201—John Corbett O'Meara, District Judge.

Argued:  June 11, 1999

Decided and Filed:  January 5, 2000

Before:  WELLFORD, NELSON, and GILMAN, Circuit
Judges.

————————————

## COUNSEL

**ARGUED:**  Frank D. Eaman, BELLANCE, BEATTIE &
DeLISLE, Harper Woods, Michigan, for Appellant. Kathleen
Moro Nesi, OFFICE OF THE U.S. ATTORNEY, Detroit,

Michigan, for Appellee.  **ON BRIEF:**  Frank D. Eaman, BELLANCE, BEATTIE & DeLISLE, Harper Woods, Michigan, for Appellant.  Kathleen Moro Nesi, OFFICE OF THE U.S. ATTORNEY, Detroit, Michigan, for Appellee.

————————————

## OPINION

————————————

HARRY W. WELLFORD, Circuit Judge.  This criminal prosecution pertains to one of six defendants who were tried on charges of conspiracy to conduct and participate in a Detroit-based racketeer influenced and corrupt organization.[1] Appellant Jack W. Tocco ("Tocco") was convicted on two counts of conspiracy in violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(d) ("RICO") — one for engaging in a pattern of racketeering activity and one for collection of an unlawful debt (Counts One and Two) — and one count of conspiracy to interfere with commerce by extortion in violation of 18 U.S.C. § 1951 ("Hobbs Act") (Count Six).  Both Tocco and the government now appeal -- Tocco from the jury convictions, the government from the sentence imposed by the trial judge.

## A.  Background[2]

On March 14, 1996,  Tocco was charged in a twenty-five (25)-count indictment along with sixteen (16) co-defendants on charges relating to the activities of a group called "Cosa Nostra," also known as "the Outfit" or, as is known to the general public in the United States, "the Mafia."  Cosa Nostra

———

[1]The six co-defendants were Jack W. Tocco (appellant), Anthony J. Tocco, Anthony J. Corrado, Anthony J. Zerilli, Nove Tocco, and Paul Corrado.  Before testimony was taken, Zerilli's case was severed due to health reasons.

[2]The factual background of this case spans three decades and will be discussed only insofar as the facts relate to the issues on appeal.

appropriate, and also consider the place of incarceration and its potential for monitoring Tocco's medical problems.

## H. Conclusion

We recognize that one of the most difficult and thankless responsibilities of a district judge is to pass sentence upon a defendant.  The district court in this case was faced with a complex and lengthy trial, and we give the district court its due deference in effectuating a sentence upon Tocco, guided by all pertinent legal considerations.  The district court must ordinarily rely in considerable measure upon a presentence report, but it is the district court that must make the hard decisions in cases such as this with a wide range of sentencing issues and legal determinations to be made.  The district court has broad discretion in dealing with requests for departure, whether upward or downward, but the Sentencing Commission and the courts expect that they will not often occur, and only where there are particular "aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the [Sentencing] Commission." *Koon*, 518 U.S. at 94.

Accordingly, we **AFFIRM** Tocco's convictions for the reasons explained above, but **VACATE** his sentence and **REMAND** for resentencing in a manner not inconsistent with this opinion.

departure from the guidelines based on the defendant's wife's "severe psychiatric problems" which had "potentially life threatening" effects and thus constituted a "truly exceptional case." *Haversat*, 22 F.3d at 797. Though the court found that the defendant's family ties constituted a permissible basis for a downward departure, it concluded that the particular circumstances did not justify the magnitude of the departure. *Id*. at 798 (citing *Williams v. United States*, 503 U.S. 193 (1992)).

On remand, we instruct the district court to revisit this issue and to make specific findings regarding Tocco's personal involvement in the care of his wife or other family members. The court should consider whether Maria Tocco has alternate sources of support other than her husband. On that subject we note that Tocco has eight children, seven of whom live in the area and one of whom is a doctor.

We specifically do not adopt the rationale in this regard, and in respect to other factors claimed by Tocco, applied in the case of *United States v. Rioux*, 97 F.3d 648, 652 (2d Cir. 1996), which approved a 10 point downward departure based on "physical condition, charitable fund-raising efforts, and civic accomplishments."

Thus, we conclude that the sentence imposed upon defendant Tocco was "imposed in violation of law" and that it was imposed as a result of an incorrect application of the guidelines for the reasons stated. We must, therefore, **REMAND** for re-sentencing in a manner not inconsistent with this opinion. In addition, we order the district court to furnish the government copies of any written recommendations from the probation office that have been and will be used in resentencing. Any confidential reports may be submitted under seal.

During the interim before re-sentencing, we direct the district court to consider promptly the government's motions for immediate revocation of Tocco's bond. Furthermore, in connection with resentencing, the district court should reconsider whether a term of supervised release is

allegedly is made up of "families" in various cities, including Detroit, and allegedly is involved in illegal activities such as extortion, illegal lotteries ("numbers"), bookmaking, loansharking, and acquiring undisclosed and illegal investments in gambling casinos. The indictment herein alleged that Tocco had been involved in the Detroit branch of the national Mafia organization, and that he had been the "Boss of the Detroit Cosa Nostra Family" since about 1979. The district court severed the trial of Tocco and his five co-defendants from the trials of the others named in the indictment.

On January 27, 1998, trial commenced against Tocco and his co-defendants. Approximately three months later, on April 29, 1998, the jury convicted Tocco on the two RICO conspiracies and the Hobbs Act conspiracy mentioned above. It acquitted him on ten counts of extortion or attempted extortion. On October 23, 1998, the district court denied the government's request for a forfeiture judgment against all the defendants.

On November 13, 1998, the district court sentenced Tocco to twelve months and one day in prison, departing downward ten levels from the applicable guideline range, and recommended that Tocco's sentence be served in a community correction center. Tocco filed a timely appeal from the district court's judgment of conviction, and the government timely appealed Tocco's sentence.

## B.  *Voir Dire*

Tocco first challenges the adequacy of the jury *voir dire*. A district court's manner of conducting *voir dire* is not reversible unless the court abused its discretion. *See United States v. Phibbs*, 999 F.3d 1053, 1071-72 (6th Cir. 1993). It is well-settled that the district court enjoys broad discretion in establishing its *voir dire* procedures. *See United States v. Lanier*, 33 F.3d 639, 657-59 (6th Cir. 1994) (citing *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)), *vacated on other grounds*, 114 F.3d 84 (6th Cir. 1997); *see also Deel v. Jago*, 967 F.2d 1079, 1087 (6th Cir. 1992) (same).

Tocco claims that he was denied his right to a fair trial because the district court declined to permit specific questions during *voir dire* on the subject of Mafia prejudice. Tocco's counsel filed a motion requesting that the prospective jurors be asked whether they possessed any strong opinions about the Mafia, or whether they believed that Italian-Americans were more likely to be members of organized crime. The motion was accompanied by Detroit newspaper articles referring to "Detroit's Mob" and the Detroit Mafia. Tocco claims that the district court's denial of that motion constituted reversible error because of the very high-profile nature of the case and the substantial unsympathetic publicity in the media.

The government argues that the district court was not compelled to allow questions on the specific issue of Mafia prejudice, and that the questions posed to the prospective jurors were adequate to ensure Tocco a fair and impartial jury. The district court asked the prospective jurors to answer the following in the juror questionnaire:

> 41.  You are being asked to participate in jury selection process that will select a jury to try a criminal case in which the government prosecutors charge several defendants with involvement in a racketeering conspiracy. The government alleges that the defendants are participating in a conspiracy call [sic] "Cosa Nostra" or the "Mafia." To the best of your knowledge, have you heard anything about this case? ___ yes ___ no.

The district court informed counsel that it would question individual jurors more specifically about the matter if the juror's answer to that question was affirmative. Otherwise, the court refused to ask the jury pool more specific questions pertaining to the Mafia.

While we are aware that the district court has broad discretion in such matters, we are mindful that this case attracted much media attention. This court has indicated that the district court is in the best position to determine the appropriate areas of inquiry in such cases.

We are concerned about the discrepancy between the district court's actions in Tocco's case and in the case of Anthony Corrado. The district court declined to depart downward due to the medical condition of Corrado, who had undergone seven bypass operations, had circulation problems, and had diabetes. We shall expect the district court to consider the decision in Corrado's case when it determines whether or to what extent to depart in Tocco's case.

### (c) Tocco's wife's health

Pursuant to the guidelines, "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the guidelines." U.S.S.G. § 5H1.6. However, "[e]xtraordinary family circumstances, *i.e.*, outside of the 'heartland' of cases the Guidelines were intended to cover, can be the basis for a downward departure." *United States v. Haversat*, 22 F.3d 790, 797 (8th Cir. 1994) (quoting *United States v. Harrison*, 970 F.2d 444, 447 (8th Cir. 1992)). The district court determined that Tocco qualified for a 2-level downward departure because of his "family ties," specifically his need to be with his ill wife, who had cancer and emphysema.[14] The presentence report included an extensive and extremely sympathetic family history of Tocco, including information that his wife had recently undergone an operation, and that their eight children were successful and supportive.

Extraordinary and special family circumstances may justify a downward departure in exceptional cases. Usually, this factor is taken into account when a defendant *personally* is required to take care of a seriously ill spouse or family member. A good discussion of the type of circumstances necessary for such a departure can be found in *United States v. Haversat*, 22 F.3d 790, 793 (8th Cir. 1994). In that case, the district court had approved of a 5-level downward

---

[14] Tocco's mother and sister are also ill, but the district court did not rely on Tocco's responsibilities toward those family members in departing downward.

arteriosclerotic disease, coronary artery disease, hypertension, renal insufficiency, labrynthitis, and diverticulosis. The report also mentioned that Tocco's continuing health problems required "periodic monitoring."

We conclude that Tocco's age alone should not be considered as a basis for a substantial downward departure. Tocco was portrayed as remaining active in civic and charitable affairs and in carrying on (with family help and support) a number of business interests. The district court did not discuss any basis for consideration of Tocco's age as a basis of downward departure *per se*, as set out in the judgment. We observe in passing in this regard that eight judges of this court, still in service, are seventy years old or older. Many persons in business continue to serve in important capacities beyond seventy years of age.

With respect to the propriety of a downward departure based upon Tocco's physical condition, we note that it is possible "that an aged defendant with a multitude of health problems may qualify for a downward departure under § 5H1.4 . . ., [but] such downward departures are rare." *United States v. Johnson*, 71 F.3d 539, 545 (6th Cir. 1995). In *Johnson*, the district court had departed downward from the applicable guideline range based on the defendant's medical condition. The defendant in that case had a profile similar to that of Tocco, being a 65-year-old man who suffered from diabetes, hypertension, hypothyroidism, ulcers, potassium loss, and reactive depression. *Id*. at 544-45.

The *Johnson* court stated that "[i]n view of the fact that the defendant will be resentenced, the District Court should make more specific findings as to whether defendant has 'an extraordinary physical impairment,' or combination of impairments, worthy of departure." *Id.* at 545. We find that this approach is proper in the instant case. To this end, the district court might obtain independent and competent medical evidence to determine the extent of Tocco's infirmities and the prison system's ability or inability to accommodate them. *Id.*

[W]ide discretion [is] granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.

*Lanier*, 33 F.3d at 657 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). The Supreme Court and this circuit have set out the principles involved in determining whether the failure to ask specific questions amounts to "an unconstitutional abuse of discretion":

There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups. . . . [T]here is no per se constitutional rule in such circumstances requiring inquiry as to racial prejudice. . . . Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion.

*Rosales-Lopez v. United States,* 451 U.S. 182, 190 (1981) (citations omitted).

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

*United States v. Blanton*, 719 F.2d 815, 830 (6th Cir. 1983). It suffices "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). *See also Hill v. Brigano*, No. 98-3714, 1999 WL 1222642, at *8-*9 (6th Cir. Dec. 22, 1999).

Having said all that, we still believe the district court would have been well-advised to allow more detailed questioning to reveal an individual prospective juror's prejudice, if any, against Cosa Nostra and the obvious Italian heritage of the defendants and the Sicilian or Italian connection with the Mafia. We decided similar issues concerning voir dire method and jury selection in a highly publicized case, *United States v. Blanton*, 719 F.2d 815 (6th Cir. 1983) (en banc). The court majority, in considering challenges to the sufficiency of voir dire in the criminal trial of a recent Tennessee governor, concluded that no reversible error occurred, although the trial judge probably did not employ the best voir dire procedures and we would not recommend the manner of such voir dire. *See id.* at 819, 822. We have the same reservations, as did the court majority in *Blanton* (and the writer was one of those judges), about voir dire and jury selection in this case.

Nevertheless, the district court sought to ensure the fairness of the jury selection through more general, progressive questioning. After obtaining the prospective jurors' answers to the "Mafia" question in the questionnaire, the court followed up with each juror individually and asked more specific questions about their knowledge of the case. Of the twelve jurors that ultimately were chosen to sit at trial, seven had heard nothing about the case, and the other five had only had minimal knowledge. The five that had minimal knowledge of the case individually assured the district court that they could, despite that knowledge, render a fair and impartial verdict. Furthermore, the jurors all informed the court of their ability to assume that an accused is innocent until proven guilty beyond a reasonable doubt, and to accept

On remand, the district court must determine whether the "community involvement" of Tocco is substantially financial, which would prevent the court from considering that factor in departing from the guidelines on that basis. If, however, the court finds as a matter of fact that the community involvement actually involves significant contributions of Tocco's time and personal skill and involvement, the court may consider the factor in determining the appropriate and reasonable degree of departure if the court concludes that the case presents truly extraordinary circumstances. The district court should be mindful that any departure must be reasonable and must be "guided by the structure of the Guidelines." *Crouse,* 145 F.3d at 792; *see also United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998); *United States v. McHan*, 920 F.2d 244, 247 (4th Cir. 1990).

### (b) Tocco's age and debilitating health

The guidelines note that both age and physical condition may be valid grounds for a downward departure. U.S.S.G. § 5H1.1 provides in relevant part that although not "ordinarily relevant ... [a]ge may be a reason to go below the guidelines when the offender is elderly and infirm and where a form of punishment (e.g., home confinement) might be equally efficient as and less costly than incarceration." With respect to physical infirmity, the guidelines provide that a defendant's "[p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4.

The district court below determined that Tocco's age, 72 years, and debilitating health, "which ordinarily would not be the basis for downward departure," was a basis for departure in this case. The court referred to the presentence report which described all of Tocco's illnesses, including

businessman much in the same category as Tocco. Though the applicable guideline range for his sentence was 15, the district court departed downward 9 levels based on the defendant's charitable works in order to bring his offense level down to 6 so that the defendant would qualify for home confinement. The court noted that the community contributions consisted primarily of the defendant's time commitments and not monetary contributions. *Crouse*, 145 F.3d at 792. On appeal, we determined that considering the defendant's charitable works, though a discouraged factor, was a permissible ground for the district court to consider departing downward. *See id.* at 791. We found, however, that the defendant's community works, while significant, were not unusual for a prominent business man. The works included, but were not limited to, involvement in church activities, service on the boards of various organizations, and involvement in the Rotary Club. We concluded that, while some departure may have been warranted, the 9-level departure was unreasonable because the district court made no reference to the guidelines determining the departure amount. Rather, the district court sought to reach a certain result--no jail time--and it departed the necessary number of levels to reach the desired result. Consequently, we held that the departure was unreasonable under the circumstances. *See id.* at 792.

In assessing the effect of Tocco's community involvement in this case, we believe that much of Tocco's contributions may have consisted of contributions of money, not time and energy. If that is so, then the factor could really be considered one involving Tocco's socio-economic status, *i.e.*, his wealth and his ability to donate to various civic and charitable causes. Consideration of that factor is prohibited by the guidelines. *See* U.S.S.G. § 5H1.10. This, perhaps, is an expression of the ancient concept of justice that a man of wealth, position, power, and prestige should not be given special consideration in the law. In any event, a defendant's community involvement is at best a *discouraged* factor in determining the appropriate departure from the guidelines.

that a defendant does not forfeit his presumption of innocence if he chooses not to testify. In our view, Tocco was not constitutionally entitled, under the circumstances, to any more specific race-based questioning during *voir dire*. "The Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).[3]

This issue regarding *voir dire* is of serious concern to this court. We believe that the district court's failure to ask more specific questions regarding Mafia or Italian-American prejudice was a mistake, but not an error compelling reversal under the circumstances. The district court's *voir dire* sufficiently explored the prospective jurors' knowledge about the Mafia-related case and their individual ability to be fair and impartial. As the Supreme Court has stated, "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." *Rosales-Lopez*, 451 U.S. at 190. Based on the foregoing, we believe the procedures for jury selection, viewed in their entirety, afforded Tocco a fair and impartial jury. Accordingly, we find that any error committed in failing to allow more specific *voir dire* questions on Mafia prejudice does not require a reversal of Tocco's conviction.[4]

---

[3] The fact that the jurors found defendant Tocco not guilty on ten counts, and that they acquitted other defendants in part or entirely, is some indication of the jury's ability to act with impartiality.

[4] Much of Tocco's pretrial argument focused on the stigma attached to the words "Cosa Nostra" and "Mafia" as those terms were used in the indictment charges. The charges in this case, however, would not differ materially from a charge that a particular defendant was allegedly in a particular group or gang, such as "Hell's Angels," or "White Citizen Council," or a subversive group such as an international terrorist organization. We would not deem such an indictment charge to constitute prejudicial error so long as the prosecution was prepared to come forward with proof to establish the existence of such a group, and that the particular defendant was associated with the alleged criminal enterprise or conspiracy.

## C. Severance

Tocco also argues that the district court erred in failing to sever his trial from that of co-defendants Nove Tocco ("Nove") and Paul Corrado ("Corrado"). A district court's decision to deny severance of defendants is reviewed for a "clear abuse of discretion." *United States v. Critton*, 43 F.3d 1089, 1098 (6th Cir. 1995). The defendant "has a heavy burden of showing specific and compelling prejudice" from having a joint trial. *United States v. Harris*, 9 F.3d 493, 500 (6th Cir. 1993).

Tocco claims that his trial should have been severed from that of Nove and Corrado because there was no evidence that he was a co-conspirator of those two defendants. He argues that certain tape recorded statements of Nove and Corrado were entered into evidence, and that such evidence never linked him with those defendants. Thus, he claims that the evidence unfairly prejudiced his case, and he should have been given a separate trial.

We find that Tocco's position is an extension of his argument that the evidence was insufficient to find that a conspiracy existed between him and the other defendants. For reasons discussed below, we find that the evidence was sufficient to support a finding that such a conspiracy existed. Joint trials are favored in this circuit, and "it is well-settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States*, 506 U.S. 534, 540 (1993). We must presume that juries are "capable of sorting out the evidence and considering the case of each defendant separately." *Harris*, 9 F.3d at 501. The fact that the jurors in this case found Tocco not guilty on ten counts and acquitted co-defendants on other counts is some indication that the jury was able to sort out the issues and follow the court's

that could constitute grounds for departure in an unusual case." U.S.S.G. ch. 1, pt. A, intro. comment.

The district court in this case applied discouraged factors in departing downward, emphasizing insistently its view that this was an "extraordinary" case. The court stated that this case was outside of the heartland of cases, presenting "an extraordinary set of facts and is highly infrequent and rare. . . . It can be no rarer. The Court's [sic] never [departed in this manner] before and the Court does not contemplate doing it again soon." Then the court noted that the case has spanned over three decades and related to criminal activity that occurred over that entire period of time. The court also made the determination that Tocco did not have the type of "absolute power" that would justify him being held responsible for any and all criminal acts that the members or associates of his criminal enterprise may have committed or conspired to commit. Thus, the court was generally of the view that a downward departure was necessary.

With that as a preface, the court turned to the three specific factors on which it relied in making the 10-level downward departure in Tocco's sentence. We now discuss those three factors.

### (a) Community service and community support

First, the court found that Tocco's extraordinary community involvement and community support warranted a 4-level departure. The court noted that Tocco had participated in no less than twelve charitable and civic organizations. A flood of letters poured into the court that strongly supported Tocco and urged leniency in his sentencing. The letters stated, among other things, that Tocco is a dedicated family man and a dependable philanthropist in the community. These circumstances, the court found, helped to show that this case is outside of the heartland of cases.

We addressed the propriety of a departure in similar circumstances in *United States v. Crouse*, 145 F.3d 786 (6th Cir. 1998). *Crouse* involved the sentencing of a successful

be sufficiently unusual and "outside the heartland of cases" to warrant such a departure. *See United States v. Crouse*, 145 F.3d 786, 788-89 (6th Cir. 1998). If we determine that the departure was not based on impermissible factors, we must still determine whether the departure was reasonable in terms of the amount and the extent of the departure in light of the reasons for the departure. *See id.* at 789. In other words, we must find that the reasons justify the magnitude of the departure. *See id.*

Based on our conclusion that the district court must revisit the sentence imposed under the guidelines, we further instruct the court to reconsider its decision to depart from the guideline range once that range has been redetermined. We discuss below our views regarding the downward departure in this case to guide the district court's decision on remand.

In *Koon, supra,* the Supreme Court discussed what factors may or may not be considered by a district court in determining whether a departure from the guidelines is warranted. The Court discussed some "encouraged factors," which "are those 'the Commission has not been able to take into account fully in formulating the guidelines.'" *Koon*, 518 U.S. at 94 (citing U.S.S.G. § 5K2.0). The court also discussed "discouraged factors," which "are those 'not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range.'" *Id.* at 95 (quoting 1995 U.S.S.G. ch. 5, pt. H, intro. comment.). Examples of those "discouraged factors" include a defendant's civic contributions and his family ties and responsibilities. Though those factors are "not necessarily inappropriate," the Court noted, they should only be relied on as a basis for departure "in exceptional cases." *Id.*

The guidelines list certain factors that may never for the basis for departure. *See* U.S.S.G. § 5H1.10 (race, sex, national origin, creed, religion, socio-economic status); § 5H1.4 (drug or alcohol dependence). With the exception of those factors, the guidelines do not "limit the kinds of factors, whether or not mentioned anywhere else in the guidelines,

instructions with respect to each defendant separately.[5] Accordingly, we find that the district court did not abuse its discretion in failing to sever Tocco's trial from that of Nove and Corrado.

## D. Admissibility of Evidence

Tocco raises seven alleged errors regarding the district court's admission of evidence. Generally, a district court's decision to admit testimony and other evidence is reviewable under an abuse of discretion standard. *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993). Even if the district court abuses its discretion in this regard, we will not reverse a conviction on that basis unless the "substantial rights" of a party are affected. *Id.* We will note below the issues to which a different standard of review applies.

### (1) Testimony of Anthony Polizzi

An important part of the government's case against Tocco was the testimony of Angelo Polizzi ("Angelo"). Angelo testified about statements made to him by his father, Michael Polizzi ("Polizzi"), who died shortly before trial in this case, which the district court held to be admissible as declarations against penal interest. *See* FED R. EVID. 804(b)(3).[6] Tocco

---

[5] Tocco cites *United States v. Casamento*, 887 F.2d 1141, 1152 (2d Cir. 1989), in arguing that "megatrials" should not be permitted and that there should be a presumption against a joint trial in cases that are estimated to last more than four months. This circuit, however, has not adopted such a policy, and we decline to do so in this case. We adhere to the "strong policy in favor of joint trials when charges will be proved by the same series of acts." *United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988); *see also United States v. Mays*, 69 F.3d 116, 120 (6th Cir. 1995) (recognizing the "strong policy in favoring joint trials" and "the presumption of the validity of curative instructions").

[6] FEDERAL RULE OF EVIDENCE 804(b)(3) provides in pertinent part:

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

now argues that the district court erred in allowing Angelo to testify about his father's statements. We review *de novo* the issue of whether the district court properly held those statements to be admissible. *See United States v. Fountain*, 2 F.3d 656, 668 (6th Cir. 1993).

The statements challenged by Tocco are in one of two categories: (1) statements that others were involved in the conspiracies and (2) statements about Polizzi's own involvement in the Frontier Hotel and Casino, which were made after Polizzi had been convicted and sentenced based on that involvement.

Without directing the court's attention to specific statements, Tocco claims that "[w]hile a statement of [Angelo] Polizzi's father that he, himself, was involved in organized crime may have been a declaration against his father's penal interest, the statements that *others* were involved in illegal crime were not declarations against his father's penal interest." In support, Tocco relies on *Williamson v. United States*, 512 U.S. 594 (1994), in which the Supreme Court held that the declarations of a criminal that implicate another person are admissible only to the extent that they are self-inculpatory. *Williamson*, 512 U.S. at 599. In determining whether Polizzi's statements qualify as declarations against penal interest, we must consider (1) whether the declarant is unavailable; (2) whether, from the perspective of the average, reasonable person, the statements were truly adverse to the declarant's penal interest, and (3) whether corroborating circumstances truly establish the trustworthiness of the statement. *United States v.*

---

. . .

(3) **Statement against interest.** A statement which at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

---

followed the recommendations of different probation officers in holding the two accountable for a two-level increase for each one's role in the offense as an organizer, leader, manager, or supervisor. *See* U.S.S.G. § 3B1.1(c). Nove and Corrado managed John Sciaratta, John Jarjosa, and others who collected the "street taxes" for them. The government argues that adding the four other defendants in this case easily supports the claim that Tocco supervised five or more participants.

We find from a review of the record that the district court committed clear error in concluding that Tocco did not have a supervisory role in this case. As the government points out, the district court ignored the fact that the jury found Tocco guilty on Count Six, the Hobbs Act violation. The government's theory of the case was that Nove and Corrado could not engage in their extortionate activities without the permission of Tocco. The wiretapped conversations between Nove and Corrado showed that Tocco was the "boss" and that he had control over the extortionate activities of his underlings. The jury found Tocco guilty of conspiring to commit those extortionate activities in Count Six, indicating that they found Tocco to be the "boss" or "manager" or "supervisor." Under these circumstances, we instruct the district court on remand to apply the three-level enhancement for Tocco's supervisory role in the offense pursuant to U.S.S.G. §3B1.1(b).

### (3) Downward departure

As we stated above, the district court departed downward 10 levels based upon Tocco's overwhelming community service and support (4 levels), Tocco's age and debilitating health (4 levels), and Tocco's wife's poor health (2 levels). A district court's decision to depart downward from the applicable guideline level is reviewed for an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 91 (1996). Whether a stated ground for departure is a permissible basis is a question of law reviewable *de novo*. *See id.* at 98. Before a departure is authorized, the circumstances of the case must

discharge of a weapon (7 levels, § 2B3.2(b)(3)(A)(i)); and for his supervisory role in the offense (3 levels, § 3B1.1(b)). The court also rejected the government's contention that a 5-level enhancement was appropriate under the grouping provisions of § 3D1.3. Whether Tocco's offense level should be enhanced by the first three items, which are specific offense characteristics of extortion, will depend on whether the district court ultimately sentences Tocco pursuant to § 2B3.2 or some other guideline. The court did not address those issues below because it used the minimum of 19 as the base offense level and did not refer to the specific offense characteristics in § 2B3.2(b), nor did it enhance the offense level for Tocco's supervisory role. On remand, depending upon the district court's review of the application of the extortion guideline, the court must reconsider whether any enhancements under that guideline would apply under the circumstances.

At sentencing, after the district court announced that none of the government's requested enhancements were applicable to Tocco's offense level, the prosecutor asked whether the court adopted the presentence report's conclusion that "none of the threats or acts of violence were reasonably foreseeable" as part of the conduct involved. The district judge made no response or explanation to this pertinent question. We find that the foreseeability of the threats and acts of violence may be critical to the district court's analysis on remand, and we direct the district court to make specific findings with respect to that issue.

The government argues that the evidence supported a finding that Tocco was the "boss" of the enterprise and that he had a supervisory role over five or more persons, and that consequently a 3-level enhancement was warranted pursuant to U.S.S.G. § 3B1.1(b).[13] The government points out that in the sentencing of Nove Tocco and Paul Corrado the court

---

[13]That guideline provides that "[i]If the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels." U.S.S.G. § 3B1.1(b).

---

*Maliszewski*, 161 F.3d 992, 1009 (6th Cir. 1998), *cert. denied*, 119 S. Ct. 1126 (1999).

Among other things, Polizzi told Angelo about Tocco's role in the Cosa Nostra organization, and about the identity of other organization leaders. Polizzi stated that Tocco had been the leader since 1979, and that defendant Zerilli was the leader before him. All were related by blood or marriage. Polizzi had identified Paul Corrado and Nove Tocco as underlings in the enterprise. Angelo at the time himself assumed a role in the conspiracy by making deliveries and collections for his father.

Tocco argues that Polizzi's statements implicating others were inadmissible because they were about others and were not adverse to Polizzi's own penal interest. We agree that our decision should be guided by *Williamson.* In that case, the Supreme Court recognized that "[t]he question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of the surrounding circumstances." *Williamson*, 512 U.S. at 603-04. The court also noted that statements must be viewed in context. For example:

> "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest.

*Id.* at 603; *see also United States v. Price*, 134 F.3d 340, 347 (6th Cir.), *cert. denied*, 119 S. Ct. 114 (1998).

We believe that Tocco's argument ignores the context in which Polizzi's statements were made to his son. The statements described Polizzi's own participation in the RICO enterprise, and inculpated himself and others as participants

in the conspiracy.    Those statements are not rendered inadmissible simply because they implicate others.  Justice Scalia explained a similar situation in his concurring opinion in *Williamson*:

> For example, if a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket, naming some of the other actors and thereby inculpating himself on racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest.

*Id.* at 606-07 (Scalia, J., concurring).    Here, Polizzi's statements about the conspiracy linked himself to the others in the conspiracy, and were therefore against his own penal interest.  Thus, we decline to hold that those statements were rendered inadmissible by virtue of the fact that others were implicated.[7]   *See United States v. Barone*, 114 F.3d 1284, 1295 (1st Cir. 1997) (finding admissible statements that "demonstrate 'an insider's knowledge' of a criminal enterprise and its criminal activities").

Tocco also claims that any statements about Polizzi's involvement in the Frontier Hotel and Casino case were not against his penal interest because he had been convicted and sentenced for that conduct at the time he made the statements. In other words, Polizzi was already in prison, so no penal interest was at stake.   We disagree, because Polizzi's involvement in the Frontier Hotel and Casino was a predicate act of the RICO conspiracy charged in this case, a conspiracy

---

[7] When Polizzi made the statements about involvement in organized crime in Detroit and about Cosa Nostra, the statements were not made with the hope of implicating others to gain favor with the police. Under the circumstances, we believe that other corroborating factors also support admissibility of the Polizzi testimony.  *See Price*, 134 F.3d at 348 (discussing what types of corroborating evidence demonstrate trustworthiness).

of the conspiracy and what activities were reasonably foreseeable by Tocco.  We remand these issues to the district court, and we instruct the district court to determine which underlying offenses may properly be attributable to Tocco for purposes of sentencing him under § 2E1.1.  The court should then determine the offense levels applicable to those offenses and "make the appropriate adjustments under Parts A through D of Chapter Three of the guidelines, using the [alternative] base offense levels in turn, and compare the results."  *United States v. Sarault*, 975 F.2d 17, 18 (1st Cir. 1992) (determining that the district court properly followed the "protocol" of comparing the offense levels to determine whether it should use the minimum level of 19 or the offense level attributable to the underlying racketeering activity in sentencing the defendant); *see also United States v. Damico*, 99 F.3d 1431, 1436-37 (7th Cir. 1996) (noting that parties agreed on four "groups" of underlying racketeering activity).

The district court should note that any enhancement for grouping pursuant to § 3D1.3 would be added to the offense level calculation in § 2E1.1(a)(2), but not to the minimum offense level calculation in § 2E1.1(a)(1) for purposes of determining which equation produces the greater result. *See Damico*, 99 F.3d at 1435 (finding that 4-level adjustment under § 3D1.4 caused the subsection (a)(2) calculation to exceed the calculation using the minimum level in subsection (a)(1)); *United States v. Boggi*, 74 F.3d 470, 473 (3d Cir. 1996) (reasoning that the (a)(2) calculation is greater because "only the subsection (a)(2) offense level will receive a four-level adjustment under section 3D1.4").  When the court arrives at the alternative adjusted offense levels, it must apply the highest adjusted offense level in sentencing Tocco.

**(2) Enhancements**

As we have indicated, the district court rejected the government's contentions that Tocco's offense level should have been increased because of the threat of death, bodily injury, or kidnapping (2 levels, § 2B3.2(b)(1)); because the loss exceeded $10,000 (1 level, § 2B3.2(b)(2)); for the

with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.

U.S.S.G. § 1B1.3, note 2.

We agree with the government that the offense level applicable to the conduct involved in the underlying racketeering activity may exceed the offense level produced by the § 2E1.1(a)(1) minimum level of 19, depending on what conduct is considered. The difficulty in this case is that the district court failed to make any specific findings on what conduct may be considered, and it failed to make any comparisons of the resulting offense levels from the underlying racketeering offenses. As we have stated, this case involves more than one underlying offense, and the district court must "treat each underlying offense as if contained in a separate count of conviction of the purposes of (a)(2)." U.S.S.G. § 2E1.1, note 1.

We agree with Tocco that he can only be held responsible for actions of his co-conspirators that were in furtherance of the jointly undertaken activity and that were reasonably foreseeable in connection with that activity. *See* U.S.S.G. § 1B1.3. He is, however, "potentially liable for the foreseeable criminal acts of others in furtherance of th[e criminal] enterprise even though he did not personally participate in them." *United States v. Carrozza*, 4 F.3d 70, 75 (1st Cir. 1993). The district court made no findings whatsoever as to what criminal activities were in furtherance

of which Polizzi was a member and for which he was never tried and convicted.

Tocco did not raise an argument that the admission of Polizzi's statements violated his Sixth Amendment right to confront witnesses testifying against him. *See Lilly v. Virginia*, 119 S.Ct. 1887, 1899 (1999). Even if we had, the argument would have been unavailing. In *Lilly*, the Supreme Court concluded that an accomplice's out-of-court statements that inculpate a defendant cannot be admitted against that defendant unless they bear "particularized guarantees of trustworthiness." *Id.* at 1899-1900. Those guarantees must be inherent in the circumstances of the testimony itself; the fact that other evidence corroborates the testimony in question does not suffice. *Id.* at 1900. We find that the circumstances surrounding Polizzi's statements in this case indicate that the statements were trustworthy, particularly in light of the fact that Polizzi's statements were made to his son in confidence, rather than to the police or to any other authority for the purpose of shifting the blame to Tocco. *See Burton v. Phillips*, 64 F.Supp.2d 669, 680 (E.D. Mich. 1999) (reasoning that statements made to a perceived ally rather than to police officers during an interrogation are trustworthy, citing *Latine v. Mann*, 25 F.3d 1162, 1166-67 (2d Cir. 1994)). Therefore, the admission of Polizzi's statements would withstand a Sixth Amendment challenge.

Accordingly, we reject Tocco's argument that the district court erred in allowing into evidence Polizzi's out-of-court statements.

### (2)  Documentary evidence relating to Polizzi

We review the admission of exhibits under an abuse of discretion standard. *Bonds*, 12 F.3d at 554. The government argues that it sought to introduce Angelo Polizzi's plea agreement and other exhibits relating to this witness "to blunt any cross-examination impeaching of Polizzi's credibility" with respect to cooperating with the prosecution. The plea agreement provided, among other things, that Angelo Polizzi would "provide truthful and complete information." Tocco

maintains that introduction of this evidence impermissibly constituted a vouching for Polizzi's credibility, particularly since he was a key witness for the prosecution. We have considered this question previously and have concluded that "[i]ntroduction of the entire plea agreement permits the jury to consider fully the possible conflicting motivations underlying the witness' testimony." *United States v. Townsend*, 796 F.2d 158, 163 (6th Cir. 1986). We noted further:

> While the existence of a plea agreement may support the witness' credibility by showing his or her interest in testifying truthfully, the plea agreement may also impeach the witness' credibility by showing his or her interest in testifying as the government wishes regardless of the truth.

*Id.*; *accord, United States v. Mealy*, 851 F.2d 890, 898-99 (7th Cir. 1988) (holding that prosecutor may elicit testimony regarding plea agreement and may enter agreement into evidence).

Tocco counters with reliance upon *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994), which held that the prosecutor's improper reliance in closing argument on such an agreement amounted to personal vouching for the truthfulness of the witness' testimony under the circumstances. The prosecutor argued and emphasized in *Carroll* that the witness who had entered into a similar plea agreement "would be in jeopardy" if he were not testifying truthfully. *Id.* at 1389. Circumstances were not the same in this case; the prosecutor made no similar closing argument and did not personally vouch for the truthfulness of Polizzi's testimony. We do not agree with Tocco that *Carroll* supports reversal by reason of the introduction of the plea agreement as an exhibit. Indeed, the prosecutor may refer to such agreement in appropriate circumstances to deflect defendant's use of a plea agreement to *attack* the witness' credibility. *See Mealy*, 851 F.2d at 898-99. Thus, we find no error in the admission of these exhibits,

sentencing court to apply the adjustments contained in Chapter 3 of the guidelines to determine if the underlying offense would produce an offense level greater than 19.

Tocco claims that the government's argument must fail because there was no evidence adduced at trial to show that Tocco, himself, "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused" the criminal activity that the government seeks to use against him, or that the acts of his co-conspirators were "reasonably foreseeable" in furtherance of a "jointly undertaken criminal activity." *See* U.S.S.G. § 1B1.3(a)(1). Tocco argues that the government impermissibly relies on the charges in the indictment, rather than what conduct was proven at trial, in determining the relevant conduct for sentencing. Tocco relies on the application notes of § 1B1.3(a)(1):

> In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts or omissions) of others that was both:
>
> (i) in furtherance of the jointly undertaken activity; and
>
> (ii) reasonably foreseeable in connection with that criminal activity.
>
> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection

levels for Tocco's supervisory role pursuant to U.S.S.G. § 3B1.1(b). Finally, the government argues that a 5-level enhancement for grouping the offenses is appropriate under U.S.S.G. § 3D1.3. Thus, if the enhancements included by the government were applicable, Tocco's offense level applicable to the conduct related to the underlying racketeering activity would be 36 [$18 + 2 + 1 + 7 + 3 + 5 = 36$]. According to the government, the minimum base offense level of 19 under subsection (a)(1) would produce an offense level of 22, adding only the 3-level enhancement for a supervisory role to the base offense level of 19 [$19 + 3 = 22$]. Thus, because using the offense level applicable to the racketeering activity produces a higher adjusted level, the government argues that the court must use that number.[12]

We must determine, then, whether the district court erred in applying the base offense level of 19 pursuant to § 2E1.1(a)(1) or whether, according to § 2E1.1(a)(2), the court should have used "the offense level applicable to the underlying racketeering activity." The question becomes, then, what conduct must be considered in determining what constitutes "the underlying racketeering activity."

In this case, Tocco was convicted based on more than one underlying offense. The government claims that those offenses include, but are not limited to, (1) the extortion conspiracy (Count Six), (2) the illegal gambling operation, (3) & (4) the involvement in the Edgewater and the Frontier Hotels, (5) obstruction of justice, and (6) the Harry Bowman murder conspiracy. Application Note 1 to § 2E1.1 states that "[w]here there is more than one underlying offense, [the court should] treat each underlying offense as if contained in a separate count of conviction for purposes of subsection (a)(2)." *Id.* In addition, that Application Note 1 directs the

---

The government also argues that the court should have added 3 levels for Tocco's supervisory or managerial role, and 5 levels according to the grouping rules in U.S.S.G. § 3D1.4. We will address the basis for those increases separately. Here we are concerned with the appropriate *base* offense level, or starting point, for Tocco's sentence.

---

and this assignment of error, therefore, does not support a reversal of Tocco's conviction.

### (3)  Vitello's testimony about labor racketeering

The district court permitted Vitello to testify about Vito Giacolone's taking care of labor problems in Toledo. Tocco claims that allowing the "labor racketeering" testimony impermissibly "enlarged the scope of the indictment" and strayed away "from the elements of the charges." We are hard pressed to see any unfair prejudice inherent in this brief testimony. We agree with the district court that the evidence related to the charged conspiracy. Tocco requested no limiting instruction, and we cannot conclude that the district court's decision constituted reversible error.

### (4)  Investigative reports by the Nevada Gaming Commission

Through Clifton Copher, chief of the enforcement division of the Nevada State Gaming Control Board, the government introduced records of the Board, also called "investigative summaries," into evidence.[8] The government claims that these documents pertained to the application for a gaming license for the Edgewater Casino and corroborated and placed into context the conversations of co-conspirators that had been intercepted. Also, the records were relevant to the defendants obtaining a hidden interest in the Nevada gambling industry.

Tocco objected to the admission of the documents on the basis that they contained opinions and were speculative. The district court overruled that objection, finding that the documents were admissible as business records. After the witness was dismissed, the district court granted Tocco's request to redact certain portions of the reports. Six weeks

---

*See Kraft v. Jacka*, 872 F.2d 862, 867-68 (9th Cir. 1989), which sets out the Nevada regulatory procedures and controls involved.

later, the parties placed into the record an agreed-upon redaction of only one of the reports.

In this appeal, Tocco claims that the district court erred in admitting the Board's records into evidence.    Upon examination, we agree with the government that much of the documentary evidence  was not hearsay because it was based on facts that the Board had received from information supplied by the applicants.  The objectionable portions which might arguably be hearsay were redacted by agreement of the parties.  Furthermore, the exhibits were admissible for a non-hearsay purpose--they showed the predicate act of the defendants obtaining a hidden interest in the Edgewater, and they assisted in showing why the Gaming Board granted the applicants only a temporary gaming license.  Thus, we are not persuaded that the district court should have excluded these documents as inadmissible hearsay, and in view of the court's action in allowing redactions to particular objectionable portions, no error in this regard has been established.

### (5)  Judgments of conviction

At trial, the district court allowed the government to admit into evidence the certified convictions against certain of Tocco's co-defendants.  Tocco generally objected to the admission of that evidence, but at no time did he specifically complain that this was an improper use of offensive collateral estoppel.  Because we find that the admission of those convictions was permissible, we will assume for purposes of our analysis that the issue was properly preserved for review.

Tocco argues that the government is not permitted to rely on the judgments of conviction to prove the predicate acts of a RICO charge.  Such use of those convictions, he claims, constitutes improper offensive collateral estoppel, relying on the reasoning in *United States v. Pelullo*, 14 F.3d 881 (3d Cir. 1994).  In *Pelullo*, however, the district court held that the previous conviction of the defendant established the existence of a predicate act under RICO, and the court instructed the jury to recognize the predicate act as a matter of law.  *See Pelullo*, 14 F.3d at 889-90.  The instant case is different,

### (1) **The proper base offense level**

First, the government contends that the district court erred in determining the base offense level for Tocco's RICO conviction.  Because the proper application of the guidelines is a question of law, we will review this issue *de novo*. *United States v. Bazel*, 80 F.3d 1140, 1141 (6th Cir. 1996); *see also United States v. Morgano*, 39 F.3d 1358, 1378 (7th Cir. 1994).

The appropriate offense level should be determined by reference to U.S.S.G. § 2E1.1, which provides that the base offense level for unlawful conduct related to racketeer influenced and corrupt organizations is either 19 or "the offense level applicable to the underlying racketeering activity," whichever is greater.   Here, the district court concluded, consistently with the recommendation in the presentence report, that 19 was the appropriate base offense level in this case.  The report reviewed all of the overt acts of Tocco and determined that the guideline for the underlying offense was § 2E3.1, relating to gambling offenses, which requires a base offense level of 12.  Because the RICO minimum is 19 was higher, the court used that number as the base offense level for sentencing purposes.

The government argues that the extortion of Ramzi Yaldoo produced the highest base offense level as that level would have been calculated under U.S.S.G. § 2B3.2, which pertains to extortion by force or threats.   According to the government's calculations, that extortion would dictate a base offense level of 18 and would be increased by 10 levels because that crime involved  an express or implied threat of death, bodily injury, or kidnapping (increase of 2 levels, § 2B3.2(b)(1)), a loss in excess of $10,000 (increase of 1 level, § 2B3.2(b)(2)), and the discharge of a weapon (increase of 7 levels, § 2B3.2(b)(3)(A)(i)).[11]  In addition, as we will discuss below, the government advocates an increase of 3

---

[11]The government claims that the Harry Bowman murder conspiracy would also require the same offense level.

criminal activity of which he was convicted. The report takes pains to discredit the testimony of Angelo Polizzi, a key witness for the government, referring to his criminal offenses, the loss of his license to practice law, and his receiving a sentence of probation in connection with his testimony.

It also makes reference to the affidavit of Tocco's deceased former attorney and to the statements of other "defense attorneys" who maintain that Tocco "has been under constant FBI surveillance," and that certain past events "justify any feelings of harassment that he may hold against the government." The probation officer concluded that "surveillance never produced a single instance where JACK WILLIAM TOCCO was observed committing a crime or overheard discussing a crime," and then added that "[n]o evidence was introduced that JACK WILLIAM TOCCO has ever been in the company of all of the six men who are alleged by the Indictment to be 'capos' of the alleged Detroit organized crime group." Also along those lines, the report criticizes the government for its longstanding pursuit of Tocco, stating that Tocco has been under investigation for thirty years "and for some reason, the government waited until 1996, or until the defendant was aged and infirm, to indict him."

Overall, the probation office appears to have been preoccupied with expressing its concern that Tocco was unjustly pursued by the government or that his conviction was based on evidence that was not credible. We have addressed the concerns regarding the sufficiency of the evidence, and we will not reconsider those concerns at this juncture. Rather, we must focus on whether Tocco was lawfully and appropriately sentenced pursuant to the United States Sentencing Guidelines with reference to the record in this case, keeping in mind the three counts on which Tocco was convicted.

We now turn to the government's assignments of error.

because the district court here entered into evidence the convictions of Tocco's co-defendants, who had the opportunity to show the jury that he was not involved in their crimes. Furthermore, the court did not give a "collateral estoppel" instruction as the court did in *Pellulo*. The government explained that "[w]hether or not Mr. Tocco was connected to that is a jury-question for the jury to determine." Also, there was other evidence that corroborated the information about the convictions in question. Thus, because no collateral estoppel effect was given to the challenged evidence, Tocco's argument is unfounded.

### (6) FBI Agent Ruffino as an expert witness

The district court allowed one of the case agents, Samuel J. Ruffino, to testify as an expert on organized crime. Tocco claims that allowing that testimony constituted error because he received insufficient pretrial notice that Ruffino would be testifying in that capacity, and because Ruffino should not have been permitted to testify both as a fact witness and an expert witness. We review the district court's admission of expert testimony under an abuse of discretion standard. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1174-75 (1999).

After the jury had been selected but before the trial began, the government moved to have Alfonso D'Arco qualified as an expert to testify about the nature, organization, rules, and structure of the national Cosa Nostra enterprise. Though the district court initially agreed to allow that testimony, it reversed itself two days later with the agreement that it would consider a renewed motion later in the trial. On March 2, 1998, the government renewed its motion to qualify D'Arco, and it also informed the court of its intent to call Ruffino if D'Arco was not allowed to testify. About ten days later, more than a month before he testified, the government formally notified the court and all the defendants that it intended to call Ruffino as its expert on "the structure, the organization, the rules, the interpretation of phrases, and jargon that's been used in [the] trial, on the tapes, the hierarchy and the roles of

individuals." Thus, Tocco knew before trial that some form of "organized crime" expert would testify, and he knew one month before the actual testimony that Ruffino would be the expert. Tocco did not request a continuance, nor did he claim that he did not have sufficient time to examine the witness prior to his testimony. We conclude that, under these circumstances, this notice concerning Ruffino was adequate and sufficient.

Tocco also claims that the district court erred in admitting Ruffino's testimony as an expert witness because of the undue prejudice involved in Ruffino testifying as both a fact witness and an expert witness. We rejected a similar argument in *United States v. Thomas*, 74 F.3d 676 (6th Cir. 1996), where the defendant argued that a police officer should not be able to testify in a single case as both a fact witness and an expert witness. We noted that although "there is a significant risk that the jury will be confused by the officer's dual role," we are not willing to adopt a *per se* prohibition of the practice of allowing an officer to testify in two capacities. *Thomas*, 74 F.3d at 682-83. If the district court and the prosecutor take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness, then the officer's "expert" testimony may be proper. *See id.* at 683.

In this case, Ruffino's dual roles were emphasized to the jury by the fact that he testified at two different times – once early in the trial as a fact witness, and again at the conclusion of trial as an expert witness. Furthermore, the district court instructed the jury, both before he gave his opinion and again in the jury charge, that it should consider Ruffino's dual roles in determining what weight, if any, to give Ruffino's expert testimony. Under these circumstances, the district court did not abuse its discretion in allowing Ruffino to testify in both capacities.

Ruffino's testimony was certainly relevant and reliable under the principles of *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This type of

category of cases, and departed downward 10 levels from the guideline range based on Tocco's overwhelming community service (4 levels), Tocco's age and debilitating health (4 levels), and Tocco's wife's poor health (2 levels). Consequently, the final total offense level was 12, and with a criminal history category of I, the court noted that the applicable guideline range was 10 to 16 months. The court sentenced Tocco to 12 months and one day for each of the three counts of conviction, to be served concurrently, followed by two years of supervised release, and recommended a community corrections center as the place of confinement. In addition, the court ordered Tocco to complete 705 hours of community service and imposed a fine of $75,000 plus and amount equal to the cost of incarceration and supervision (approximately $20,000). The district court denied the government's request for a forfeiture judgment.[10]

The government now appeals, claiming that the district court erred in applying the § 2E1.1(a)(1) minimum base offense level of 19 rather than the offense level applicable to the underlying racketeering activity of extortion pursuant to § 2E1.1(a)(2). The government also claims that the district court should have enhanced Tocco's sentence for his role in the conspiracy, and for specific characteristics of the extortion crime including the use of threats, the discharging of a firearm, and because the total loss was in excess of $10,000. According to the government, Tocco's offense level should have been 36, calculated pursuant to § 2B3.2, for a guideline range of 188-235 months. Furthermore, the government contends that the district court erred in departing downward ten levels. We will discuss each argument below.

At the outset, we note that we can recall no presentence report comparable to the one pertaining to Tocco in the instant case, containing what might well be construed as "arguments" that Tocco was not involved in most of the

---

[10]We do not address the propriety of the district court's decision to deny the government's request for a forfeiture because the government did not raise that as an issue in its appeal.

evidence also showed that agents Finnigan and Ruffino had met with Tocco to inform him that he would be held responsible personally for violent acts that two of his unnamed associates were planning. At the time, Tocco claimed ignorance and denied that any such association existed. Less than forty-eight (48) hours later, however, Nove and Corrado received the message that the FBI had visited Tocco and had given him that warning.

That evidence, when viewing all inferences in a light most favorable to the government, supports a finding that Tocco was involved in the conspiracy to commit extortion. Though the jury may have found it justifiable to acquit Tocco on the substantive extortion counts, it could very well have found contemporaneously that Tocco was involved to some degree in a conspiracy to commit those crimes.

In sum, from our review of the voluminous record in this case, we conclude that the evidence against Tocco on the three counts for which he was convicted was not only sufficient, but it was substantial. The portions of testimony and evidence mentioned above constitute only a portion of the evidence admitted into evidence during the course of the lengthy trial. Thus, we are firmly convinced that the district court did not err in failing to grant Tocco a judgment of acquittal on any of the three counts of conviction.

## G.  Sentencing of Tocco

The district court sentenced Tocco according to the recommendation in the presentence report, finding those calculations to be "accurate and correct." The report assigned Tocco a base offense level of 19, which is the minimum level for RICO convictions pursuant to U.S.S.G. § 2E1.1(a)(1). Three points were added pursuant to U.S.S.G. § 3D1.4, which sets out the enhancements due to the grouping of the various counts, making the adjusted offense level 22. The court agreed with the report's conclusion that no other enhancements were applicable, so the total offense level remained at 22. The district court then determined that this case was an extraordinary case, outside the "heartland"

evidence regarding the inner-workings of organized crime has been held to be a proper subject of expert opinion because such matters are "generally beyond the understanding of the average layman." *Thomas*, 74 F.3d at 682; *see also United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994); *United States v. Locascio*, 6 F.3d 924, 936-37 (2d Cir. 1993); *United States v. Pungitore*, 910 F.2d 1084, 1148-49 (3d Cir. 1990). Further, to the extent that Tocco challenges Ruffino's qualifications on the subject about which he testified, we reject any such contention in light of the undisputed facts. Ruffino has extensive experience in the investigation of organized crime in the Detroit area, including 22 years with the FBI, 17 of which were spent in organized crime investigations, and his role since 1990 as the Cosa Nostra coordinator for the Detroit division, and as liason with other FBI offices and FBI headquarters. Thus, he was amply qualified to opine about the machinations of organized crime.

In summary, we conclude that the district court did not abuse its discretion in allowing agent Ruffino to testify as an expert and that his testimony met the standards of relevance and reliability. Furthermore, the dual role played by Ruffino as both a fact witness and an expert did not, under the circumstances, preclude his testimony because the transition from one role to another was separated by time and was explained to the jury.

### (7)  Co-conspirator statements

Tocco contends that the district court erroneously admitted tapes (wire intercepts) of conversations between Nove Tocco and Paul Corrado because they were not "in furtherance of the conspiracy" charged. Rather, Tocco claims, those tapes contained nothing more than idle, malicious gossip and inflammatory statements which unduly prejudiced his case.

If the conversations admitted were "nothing more than idle chatter or casual conversation about past events," they were not properly admissible. *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994); *see also United States v. Doerr*, 886 F.2d 944, 951-52 (7th Cir. 1989). The court in *Doerr*

acknowledged that "statements 'in furtherance' of a conspiracy can take many forms," such as keeping co-conspirators advised, or concealing aspects of the scheme. *Id.* at 951. The statement may also be "susceptible of alternative interpretations." *Id.* at 952; *see also Shores*, 33 F.3d at 444. *Shores* goes further to indicate that a statement may be admissible as "in furtherance of a conspiracy" even if "not 'exclusively, or even primarily, made to further the conspiracy.'" *Id.* (quoting *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987)); *see also United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989); *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982).

We are satisfied, after examining the record, that the great bulk of the admitted evidence tended to demonstrate (1) that the conspiracy in question existed; (2) that those whose statements were overheard were members of the conspiracy that included Tocco; *and* (3) that the statements were, in fact, made "during the course and in furtherance of the conspiracy at issue" according to FED. R. EVID. 801(d)(2)(E). The provision applies when "a court is satisfied that the statement actually falls within the definition of the rule." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). "[T]he existence of the conspiracy and [defendant's] involvement in it are preliminary questions of fact that under [FED. R. EVID.] 104, must be resolved by the court." *Id.*

*Bourjaily* held also in considering this issue "that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy." *Id.* at 180. Here, Nove Tocco's and Paul Corrado's conversations are probative of the existence of a conspiracy in which defendant Tocco was involved, and other evidence was probative on this matter as well. It was not error to consider that the controverted statements were made in the course and scope of the conspiracy.

We are concerned, however, with certain remarks of a racial nature that were made in the conversations that should have been excised from the tapes. For example, one of the

in an illegal gambling business (sports betting and numbers) by bankrolling the operation. The overt acts charged in Count Two were periodic distributions of funds realized from this operation to the charged partners or co-conspirators. Therefore, the separate counts were justified in this case.

The unlawful collection involved in Count Two was shown through the testimony of Angelo Polizzi, who explained that the proceeds of his father's illegal gambling business were pooled by the enterprise and then filtered to the partners in the form of weekly draws and year-end bonuses. The unlawful debt is the gambling proceeds. The government notes that only the partners who received these payments, including Tocco, were charged in Count Two. Under these circumstances, the testimony of Angelo is sufficient for a reasonable jury to find that the elements of Count Two have been supported by the evidence.

### (4) Count Six — Hobbs Act Conspiracy

Tocco claims that the evidence was insufficient to show that Tocco knew of the purpose of the conspiracy to commit extortion by Nove Tocco and Paul Corrado, which is the basis for the Hobbs Act charge in Count Six. The jury acquitted Tocco of the underlying extortions or attempted extortions that were charged against him in the indictment, but convicted him only of the conspiracy to commit those crimes. Tocco suggests that such verdicts are inconsistent and represent a compromise by some jurors who may not have thought that Tocco was actually involved in Nove Tocco's and Paul Corrado's affairs.

We agree with the government that the tape recorded conversations of Nove and Corrado, coupled with the Finnigan and Ruffino evidence, were sufficient to support Tocco's conviction on this count. Specifically, the tape recorded conversations of Nove and Corrado candidly showed a conspiracy to commit extortion by the collection of a "street tax," and also tended to show that Tocco had the authority to influence from whom they would extort money and how the collection of the "street taxes" would be enforced. The

allegations of family connections and relationships, and a pattern of criminal activity. In *Salinas*, *supra*, the Supreme Court stated that "[t]here is no requirement of some overt act or specific act in the [RICO] statute before us. . . . [Section 1962] is even more comprehensive than the general conspiracy offense in §371." *Id.* at 63. "[S]o long as the purpose of the agreement is to facilitate commission of a crime, the actor need not agree 'to commit' the crime." *Id.* at 65 (quoting the American Law Institute, Model Penal Code, Tent. Draft No. 10, p. 117 (1960)).

We believe that there was sufficient evidence for a rational jury to find that defendant Tocco agreed to "facilitate . . . some of the acts leading to the substantive offense[s]" charged. *Id.* Indeed, Angelo Polizzi testified that Tocco was the boss of the organization. Even if the proof did not show that all the substantive offenses related to the RICO conspiracy actually occurred, "[i]t is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Id.* The testimony confirmed the general nature of the enterprise, and that Tocco knew that the enterprise extended beyond his role therein.

### (3) Count Two — Collection of an Unlawful Debt

Tocco argues that Count Two is duplicitous of Count One, because Count Two charges another RICO conspiracy which has as its object the collection of an unlawful debt. It is true that Count Two relies on the same enterprise as is involved in Count One, but the crime charged in Count Two is not part of the predicate acts in Count One. These counts are not duplicitous, but they are related. In a collection of an unlawful debt conspiracy, the government need only show an agreement as to one act of collection, whereas a pattern of racketeering activity RICO conspiracy requires an agreement to commit at least two predicate acts. *See United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994); *Eufrasio*, 935 F.2d at 576. The predicate acts in count one involved Tocco's part

comments on the tapes was that "I think you might win up here [in Detroit] with a nigger trial, nigger jury." Also, a statement was made that "they seem to have success over there [in New York City] because there's so many Italians and American people, the Wasps or whatever, are so used to being around other Italians, they're accepted."

Although we agree that those particular denigrating comments were unfairly prejudicial, they were only a very minor portion of the total discussion on the tapes. Accordingly, the district court did not commit reversible error in refusing to strike the tapes in total as urged by defendant Tocco, though it would have been advisable to strike the parts that we have mentioned. We note that a case relied upon by Tocco, *United States v. Johnson*, 927 F.2d 999 (7th Cir. 1991), found that certain co-conspirator statements were improperly admitted against defendant, but that the error did not affect the "substantial rights" of the defendant and was therefore not reversible. *Johnson*, 927 F.2d at 1003. Here, as in *Johnson*, the prosecution presented substantial other evidence "from which the jury might have concluded" defendant's guilt, and his conviction will not be reversed based on the admission of the co-conspirator's statements. *Id.*

In sum, none of the evidentiary issues raised by Tocco require this court to reverse his conviction.

### E. Prosecutorial Misconduct

Tocco moved for a mistrial based upon several aspects of alleged prosecutorial misconduct, and the district court denied that motion. We review the district court's decision for an abuse of discretion. *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Id.*

When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. *See United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir.1986). If they appear improper, we then look to see

if they were flagrant and warrant reversal. *See United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir. 1994). To determine flagrancy, the standard set by this Court is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *United States v. Monus*, 128 F.3d 376, 394 (6th Cir.1997) (citing *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir. 1996)); *Carroll*, 26 F.3d at 1385 (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir.1976)). To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury. *Monus*, 128 F.3d at 394; *Carroll*, 26 F.3d at 1385-86 (citing *United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979)).

*United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999); *see also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1355-56 (6th Cir. 1993)). We will not overturn a verdict unless the prosecutorial misconduct is "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, . . . or so gross as probably to prejudice the defendant." *Pritchett*, 117 F.3d at 964 (citations omitted).

Tocco raises seven categories of government misconduct that, taken together, allegedly require reversal. For the following reasons, we are not "firmly convinced that a mistake has been made," nor are we persuaded that there has been a denial of a fair trial by the actions of the prosecutor. *See Carroll*, 26 F.3d at 1383.

We turn to the specifics of the alleged misconduct.

Thus, the government submitted sufficient evidence to show that an enterprise existed.[9]

### (2) Count One — Pattern of Racketeering

Tocco claims that the evidence did not show a pattern of racketeering. To show a pattern of racketeering activity conspiracy, a defendant need not personally agree to commit two predicate acts; rather, he need only "kn[ow] about and agree[ ] to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 66 (1997). Further, a defendant need not know about every member and component of the enterprise; he need only know "the general nature of the enterprise and that the enterprise extends beyond his role." *United States v. Eufrasio*, 935 F.3d 553, 577 n.29 (3d Cir. 1991).

Tocco argues that the government failed in its burden of showing a pattern of racketeering with respect to himself because the evidence showed no more than a series of unrelated acts by people not acting in concert with each other, although many knew each other. Tocco argues that he had no knowledge of many of the acts committed by the others in the purported conspiracy.

The testimony at trial belies Tocco's assertions. Angelo Polizzi, if believed, provided evidence to show the criminal enterprise in operation, with Tocco as a "boss" thereof. The tapes of Corrado and Nove Tocco, if believed, supported

---

[9] Tocco briefly argues that the RICO conspiracy charges are barred by the five-year statute of limitations. However, "a RICO *conspiracy* offense is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned." *United States v. Salerno*, 868 F.2d 524, 534 (2d Cir. 1989) (citing *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987)). Tocco has not persuaded us that the purposes of the conspiracy had been accomplished more than five years before his continuing involvement was shown, nor has it been demonstrated that he abandoned the ongoing enterprise. Certainly, Tocco has not shown any affirmative withdrawal. *See United States v. Rogers*, 118 F.3d 466 (6th Cir. 1997).

### (1) Counts One and Two — Proof of the Enterprise

Tocco first challenges the sufficiency of the evidence of an enterprise. The existence of an enterprise is shown "by evidence of an ongoing organization, formal or informal, and by evidence that the various associations function as a continuing unit." *Turkette*, 452 U.S. at 583. "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than ad hoc, basis." *United States v. Kragness*, 830 F.2d 842, 856 (6th Cir. 1987).

The government claims that it presented sufficient evidence to show the existence of an enterprise, which was the Detroit organized crime family called La Cosa Nostra. The majority of this proof, the government notes, came through the testimony of Angelo Polizzi and Ruffino, and through the recorded conversations admitted at trial. The testimony showed a highly structured organization with Tocco as the boss. According to the testimony, there were ten to twelve partners, all associated by blood or by marriage, including Michael Polizzi and Anthony Corrado, and several lower-level members, including Paul Corrado and Nove Tocco.

Tocco argues that the evidence fails to show an ascertainable structure distinct from any structure inherent in the conduct of a pattern of racketeering activity. Tocco's position, however, ignores the testimony of Angelo Polizzi, who testified as to statements made by his father regarding his involvement in La Cosa Nostra and the expert testimony of Ruffino, who testified about the general structure of La Cosa Nostra and other details involved in organized crime. As the Eighth Circuit has recognized, "the command system of a Mafia family is an example of th[e] type of structure" that is distinct from the pattern of racketeering activity. *See United States v. Flynn*, 852 F.2d 1045, 1052 (8th Cir. 1988) (quoting *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir. 1982)).

### (1)  Blurt-outs

Tocco claims that the prosecution improperly orchestrated questions and answers that intentionally brought before the jury opinions of experienced FBI agents that Tocco and others were "known members of the Cosa Nostra family." Tocco promptly objected to such "blurt-outs" at trial, and the district court forcefully sustained those objections and admonished counsel in that respect.

At the end of the first day of trial, the court expressed its preference that the terms "La Cosa Nostra" or "Mafia" not be used unless the defendants' participation in that group was first established. The court further stated that "it's not going to be any kind of a terminal problem if [the improper terminology] slips out." Later in the trial, when government agent Stejskal was asked why he was engaged in a surveillance of Tocco, he said because "Jack Tocco was considered to be a member of the Detroit family of La Cosa Nostra." Tocco did not object at that time, but he objected when Stejskal subsequently stated that Raffaele Qusarano was a member of the Detroit family. The district court sustained the objection, then later warned that there should be no "more conclusory testimony about we knew that these men were such and such." When Tocco moved for a mistrial on the basis of the improper comments, the district court denied the motion and explained that it had effectively sustained any objections in that regard and that a new trial was not warranted. Tocco did not request any curative instruction on the issue.

We agree, as the district court recognized, that any testimony that Tocco was a "known" member or "boss" of La Cosa Nostra was improper. The impropriety, however, was not flagrant, nor was it so pervasive as to "permeate the entire atmosphere of the trial." Rather, when Tocco objected to the improper remarks, the district court promptly sustained any objections and the government complied with the court's admonishments. Furthermore, the government was charged with proving its allegation that Tocco was a member of La

Cosa Nostra, so every reference to the group can not be deemed to have been improper. The improper witness comments constituted a very small part of the total evidence against Tocco. The district court did not decline any precautionary instructions suggested by Tocco.

In conclusion, we deem Tocco's concerns to be legitimate, but, on balance, we find that the district court did not abuse its discretion in failing to grant a new trial based on the improper episodes. *See United States v. Forrest*, 17 F.3d 916, 920-21 (6th Cir. 1994) (holding that the challenge was legitimate, but finding that the episodes did not warrant a mistrial).

### (2)  "Vouching" for the credibility of Angelo Polizzi

Tocco claims that the government improperly "vouched" for the credibility of Angelo Polizzi by entering into evidence Polizzi's plea agreement and related documents which stated that he had to testify truthfully in order to obtain lenity. Whether improper vouching amounts to prosecutorial misconduct and whether it renders the trial fundamentally unfair are mixed questions of law and fact reviewable *de novo*. *Francis*, 170 F.3d at 549.

Tocco argues that this situation is like that described in *Carroll, supra*, where this court held that the government may not "vouch" for the credibility of its witnesses by disclosing to the jury the witness's obligation under his plea agreement or by prosecutor comments suggesting that a witness will be punished by not testifying truthfully. Such a practice, we found, "improperly place[s] the prestige of the government, and even of the court, behind the credibility of the [witnesses] by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy. . . . This constitutes improper vouching. . . . We cannot overstate the extent to which we disapprove of this sort of improper vouching by prosecutors." *Carroll*, 26 F.3d at 1389.

In this case, the government introduced into evidence documents related to the benefits that Angelo received for his

omitted). The jury may draw any reasonable inferences from direct, as well as circumstantial, proof. *See United States v. Locascio*, 6 F.3d 924, 944 (2d Cir. 1993). Once a conspiracy has been proven, only slight evidence is necessary to implicate a defendant as a participant in that conspiracy if the evidence shows the connection beyond a reasonable doubt. *See United States v. Braggs*, 23 F.3d 1047, 1051 (6th Cir. 1994).

At the conclusion of the government's proof, Tocco moved for acquittal "relying on the brief filed by co-defendant [Anthony Tocco]." We have not been furnished in the substantial joint appendix a copy of that motion, so we look to Tocco's appellate brief for his position with respect to this "heavy burden" of persuasion. In an opinion filed July 30, 1998, the district court simply concluded as to this defendant that "[a]dequate evidence was adduced at trial to support the jury's verdict on all charges," and, therefore, denied Tocco's motion for acquittal and for a new trial. Here, Tocco again argues that the evidence was insufficient to convict him on all three counts of which he was found guilty.

Proof of a charge under § 1962(d) requires proof that the association or enterprise existed and that the named defendants were associated with and agreed to participate in the conduct of its affairs, which affect interstate commerce, through a pattern of racketeering activity (Count One) or through the collection of an unlawful debt (Count Two). *See United States v. Turkette*, 452 U.S. 576, 583 (1981); *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985). These elements are separate and distinct. *Turkette,* 452 U.S. at 583. Evidence used to show the existence of the enterprise may also support the participation element. *Id.* The RICO statute defines an enterprise as "includ[ing] any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

**(7) FBI escort of cooperating witness to witness stand/testifying about witness's fears**

At trial, FBI agents escorted the first government witness, Angelo Polizzi, into the courtroom and all the way to the witness chair, which Tocco claims indicated to the jury that government witnesses were in danger from the defendants. Tocco objected, and the district court directed that there be no more escorting of witnesses to the stand. Tocco argues that the district court committed reversible error in failing to grant him a mistrial because of the FBI escort of Polizzi.

The agents that escorted Polizzi were in plain clothes and without weapons. There were no prosecutorial comments relating to the escort and the need for witness protection. Though witness endangerment could have possibly been inferred, the district court resolved the issue by disallowing such escorts for the other witnesses. We find no error, much less any "egregious" error, in the action taken by the district court and denial of the motion for mistrial based upon this alleged misconduct.

In sum, we find that none of the alleged instances of prosecutorial misconduct, alone or collectively, justify a new trial in this case.

## F. Insufficiency of the Evidence

We review a challenge to the sufficiency of the evidence *de novo*, considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Jones*, 102 F.3d 804, 807-08 (6th Cir. 1996). A defendant making such a challenge bears a very heavy burden. *United States v. Spearman,* 186 F.3d 743, 746 (6th Cir. 1999), *petition for cert. filed* (U.S. Oct. 29, 1999) (No. 99-6812). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Id.* (citation

cooperation with the government. Those documents were redacted to exclude the phrase that Angelo "provided truthful and very valuable testimony." In his examination of Angelo, the prosecutor never referred to the parts of the documents that explained the benefits that were conferred in exchange for Angelo's testimony. Tocco fails to point out any comments made by the prosecutor to the effect that the government and the court would prosecute Polizzi for perjury and revoke his plea agreement if he did not testify truthfully. Nor did the prosecutor indicate that he had any other independent means of discerning Polizzi's truthfulness. Thus, the only basis for Tocco's claim is the unredacted portions of Polizzi's plea agreement and related documents, the admissibility of which we have discussed and affirmed above. There being no improper prosecutorial statements, we must reject Tocco's contention of improper vouching. *See Francis*, 170 F.3d at 549-50 (reasoning that court must first determine whether the prosecutor's statements are improper).

**(3) Impermissible comments on the exercise of Tocco's right to seek counsel**

Tocco claims that prosecutorial misconduct occurred when the prosecution elicited testimony during trial from various witnesses indicating that Tocco had requested to see an attorney, that he had consulted an attorney, and that he consulted an attorney in the company of co-conspirators. This, Tocco argues, constituted "an impermissible comment on the defendant's exercise of his constitutional right."

We find this argument to be without merit. First, it seems that Tocco did not object to most of this evidence at the time it was admitted. Rather, counsel for Anthony Tocco objected to the possible prejudice of surveillance evidence that Tocco went to Peter Bellanca's law offices. He feared that such evidence would prejudice his client, Anthony Tocco. The district court rejected that argument because the evidence tended to show Tocco's association with an illegal casino matter. It was not offered for any improper purpose. Assuming that Anthony's objection preserves the issue for

Tocco in this appeal, we find that the evidence of Tocco's visit to Bellanca's law office — or evidence that Tocco sought out or consulted the advice of an attorney generally — simply does not invade the attorney-client relationship, nor does such evidence impinge on the exercise of Tocco's constitutional right to consult with an attorney. The mere act of hiring an attorney is simply not probative of Tocco's guilt or innocence under these circumstances.

### (4)  Admitting evidence of an unrelated murder

Tocco argues that prosecutorial misconduct occurred when the government introduced evidence that the cousin of the bookmaker Yatooma was murdered. The government claims that it had offered that evidence to explain when and why Yatooma's bookmaking business suddenly increased sharply. Yatooma testified that his cousin's bookmaking customers started dealing with him after his cousin died. Tocco did not object to that evidence. When asked in cross-examination whether the defendants were involved in the murder, Yatooma responded, "Oh, no, sir, no." Though the court gave an instruction for the jury to disregard such testimony, Tocco now claims that the prejudice from that evidence was too prejudicial for a curative instruction to mitigate.

We disagree. The prosecution did not imply that the murder was related to defendant Tocco, and the evidence did not by its own nature imply such a conclusion. The witness specifically denied that Tocco or any other defendant was involved, and the district court issued a curative instruction on the matter. Under these circumstances, we find no basis for concluding that there was prosecutorial misconduct.

### (5)  Arguing facts not in evidence

Tocco argues that the prosecution twice argued facts that were not in evidence during closing argument, in that the prosecuting attorney embellished the testimony of Silverio Vitello. The prosecutor first argued that after Vitello saw Tocco, Vitello's union problem was taken care of, and second that "Tocco worked that union problem out for [Vitello]."

When Tocco objected to the second comment (he did not object to the first), the prosecutor explained that he was arguing his recollection of Vitello's testimony. Vitello actually testified that when he had problems Tocco referred him to Tony Lapiana, who had previously helped him handle union grievances.

We have examined this contention in light of the record and, again, find no justifiable basis for concluding that this episode amounted to prosecutorial misconduct. At most, as the district court apparently concluded, the prosecutor argued a mistaken recollection of the facts and the jury was reminded that it was the determiner of the true facts from the evidence. Under the circumstances, Tocco is not entitled a new trial based on this assignment of error.

### (6)  Shuffling of documents in Exhibit 116

Tocco argues that the prosecutor added pages to Exhibit 116, a Nevada Gaming Commission record, after the exhibit had been entered into evidence. Tocco alleges that an egregious error was committed when the prosecutor was allowed to refer to the pages that had been added during his closing argument. He claimed that the prosecutor impermissibly "shuffled" the exhibit to include the investigative summaries that were not a part of the exhibit when it was admitted.

From our review of the record, it is apparent that the reference to the pertinent pages of Exhibit 116 did not constitute prosecutorial misconduct. Tocco has failed to show that the portions to which the prosecutor referred were not included in the exhibit during trial, and that reference to those portions prejudiced him in any way. The district court was in the best position to assay the merits of the parties' arguments and to determine exactly what was included in Exhibit 116 according to the redaction agreement of the parties. From this record, we are not persuaded that the prosecutor engaged in misconduct with respect to its reference to Exhibit 116.