**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Mauricio RODRIGUEZ; Rafael Diaz,**
**Defendants–Appellants.**

**Nos. 00–1576, 01–1004.**

United States Court of Appeals,
Sixth Circuit.

March 29, 2002.

Before MOORE, COLE, and FARRIS,* Circuit Judges.

* The Honorable Jerome Farris, Circuit Judge for the United States Court of Appeals for the

OPINION

MOORE, Circuit Judge.

Defendants–Appellants Mauricio Rodriguez ("Rodriguez") and Rafael Diaz ("Diaz") were convicted of a drug conspiracy in violation of 21 U.S.C. §§ 841 and 846 and a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). They now appeal their convictions and sentences, raising a variety of claims. Because none of these claims has merit, we AFFIRM the defendants' convictions and sentences.

I

In 1998, while conducting a wiretap on Rodriguez's cellular phone that had been authorized by the State of New York, John Saager ("Saager"), a detective with the Drug Enforcement Task Force of the New York City Police Department ("NY-DETF"), intercepted Rodriguez's drug-related conversations with Diaz, who lived in Detroit, Michigan. Based on these interceptions, Special Agent Donald Grace ("Grace") of the Drug Enforcement Agency obtained a federal court order in Detroit for a wiretap on Diaz's phones and pager.

Police investigation resulted in the January 17, 1999, seizure of approximately $80,000 in cash from a bag carried by Rodriguez and the February 5, 1999, seizure of two kilograms of heroin from a bag in Rodriguez's car. On November 3, 1999, the United States ("Government") filed a fourth superseding indictment against Rodriguez, Diaz, and seven co-defendants. Rodriguez and Diaz were charged with two of the six counts: Count One, for conspiracy to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846, and Count Six, for conspiracy to launder monetary instruments in violation of 18 U.S.C.

§ 1956(h). Rodriguez and Diaz pleaded not guilty. Six of their co-defendants pleaded guilty; the case against the ninth co-defendant was eventually dismissed.

On January 4, 2000, after holding an evidentiary hearing, the district court denied Rodriguez's motion to suppress the evidence obtained as a result of the wiretap and the searches of his bag and car. On January 13, 2000, Rodriguez and Diaz proceeded to a jury trial and were convicted of all charges. On May 10, 2000, the district court sentenced Rodriguez to 188 months' imprisonment on each count, to be served concurrently with an undischarged sentence in New York, a five-year term of supervised release on Count One, and a concurrent three-year term of supervised release on Count Six; it also ordered a special assessment of $100 on each count. On December 11, 2000, the district court sentenced Diaz to imprisonment for 240 months on Count One and 120 months on Count Six, to be served consecutively, and a three-year term of supervised release on both counts, to be served concurrently; it also ordered a special assessment of $100 · on each count. These timely appeals followed.

II. *United States v. Rodriguez*

A. Motion to Suppress

1. Wiretap Evidence

■ Rodriguez argues that the district court erred in holding that there was probable cause for the wiretap on his phone, which a New York state court had authorized on the basis of an affidavit submitted by Saager and supported by a confidential informant. Rodriguez alleges that this affidavit was constitutionally deficient because it demonstrated "an insufficient showing of veracity of hearsay information

Ninth Circuit, sitting by designation.

from an untested drug addict informant." Appellant's Br. I at 22. With respect to a motion to suppress, we review the district court's legal conclusions de novo and factual findings for clear error, viewing the evidence in the light most favorable to the party that prevailed in the district court. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir.2000).

■ A magistrate may issue a search warrant if "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The standard for a wiretap requires a court to judge the evidence "on the totality of the circumstances and in a reasonable and common sense manner." *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 64, 102 L.Ed.2d 42 (1988). We pay "great deference ... to the determination of an issuing judge," which we will not reverse "if the record contains a substantial basis for his probable cause findings." *Id.* at 162 (quotation omitted).

In this case, Saager's affidavit was supported by a confidential informant who was working for the NYDETF for the first time. Therefore, Saager attempted to corroborate the information provided by the informant. First, he analyzed telephone records to substantiate the informant's allegation that Rodriguez had used the target cellular phone and a former cellular phone to conduct trafficking in narcotics. Saager's team also corroborated the informant's prediction that Rodriguez would be at a particular location on a particular date and at a particular time. *See Gates*, 462 U.S. at 245, 103 S.Ct. 2317 (emphasizing that the "future actions of third parties [are] ordinarily not easily predicted"). Surveillance also tended to confirm the information that Rodriguez or the person who used the target cellular phone drove a gray Oldsmobile.

In *Gates*, the Supreme Court held that "independent investigative work" that corroborated "major portions of [an anonymous] letter's predictions" was enough to sustain a magistrate's determination of probable cause. *Gates*, 462 U.S. at 244–46, 103 S.Ct. 2317. The *Gates* Court specifically noted that the corroboration of certain claims could indicate the veracity of other claims: "Because an informant is right about some things, he is more probably right about other facts." *Id.* at 244, 103 S.Ct. 2317 (quotation omitted). Although the evidence presented to the judge in this case might not have been enough to convict Rodriguez, it was sufficient to support the issuance of a wiretap on Rodriguez's phone. We therefore hold that the district court did not err in refusing to suppress the wiretap evidence.

### 2. Consent to Search

Two searches and seizures are at issue in this case: (1) the January 17, 1999, search and seizure of almost $80,000 from Rodriguez and (2) the February 5, 1999, search and seizure of two kilograms of heroin from Rodriguez's car. It is well established "that a search authorized by consent is wholly valid" under the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The prosecution is required to show only that the consent was given both freely and voluntarily. *Id.* In *Bustamonte*, the Supreme Court established that the voluntariness of a consent to a search should be determined from the totality of the circumstances, including "both the characteristics of the accused and the details of the interrogation." *Id.* at 226–27, 93 S.Ct. 2041.

a. Search on January 17

■ Although Rodriguez alleges that any consent to search that he might have given was coerced, he makes no real effort to challenge the first search and seizure. On January 17, after Rodriguez had exited a train at New York City's Penn Station, Saager and Sergeant Gerard Neville ("Neville") identified themselves as police officers, told Rodriguez "both verbally [in English] and with ... hand motions" that their dog had hit on the bag that he was carrying, and asked him if they could look inside the bag. Joint Appendix ("J.A.") at 376–78, 390. Saager and Neville later testified that Rodriguez appeared to understand them and that he gave his consent to the search. Edwin Ocasio, a Spanish-speaking investigator with the NYDETF, also testified that Rodriguez answered in the affirmative when asked in Spanish whether he understood what was going on and whether the police could search his bags for drugs.

Given these facts, we hold that the district court did not commit clear error in finding that Rodriguez expressly consented to the search of his bag. At the suppression hearing, defense counsel attempted to establish that Rodriguez did not voluntarily give his consent because (1) he was confronted at the train station by eight to ten officers and (2) he stood half a foot shorter than Saager. The other officers, however, talked to other passengers who exited from Rodriguez's train, and there is no indication in the record that Rodriguez was physically intimidated into consenting to the search.

b. Search on February 5

■ On February 5, after keeping Rodriguez under surveillance for more than nine hours, Saager "boxed [Rodriguez] into [his] parking spot" and asked him to leave his vehicle. J.A. at 383–84. Saager later testified that Rodriguez appeared to recognize him from their encounter on January 17. Noticing a bag in the back of the car, Saager asked Rodriguez in Spanish if it contained more money. When Rodriguez "shook his head no," Saager asked, apparently in English, if he could look inside the bag, at which point Rodriguez "shrugged his shoulders and then nodded his head yes." J.A. at 384. The district court observed that these gestures were less clear in their expression of consent than Rodriguez's verbal affirmation on January 17, but found that Rodriguez had consented to the search.

Rodriguez argues that his consent was coerced because he "was in shock, blocked in and unable to move, was not addressed in his own language and was surrounded by the NYPD narcotics team." Appellant's Br. I at 29. The record supports this account, although it is unclear when all the members of Saager's group arrived at the scene. However, we observe that Saager himself was the only officer who stopped Rodriguez. In addition, there is no allegation that Saager made an "overt act or threat of force against" Rodriguez or that the two men had any interaction other than the asking and answering of the question whether Saager could look inside the bag. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Furthermore, a key difference between the two searches is that Rodriguez was informed after the January 17 search – in Spanish – of his right to refuse a search. Although Saager did not offer this advice on February 5, Rodriguez knew that he did not have to consent to the search. We therefore hold that the district court did not clearly err in finding that Rodriguez consented to the search on February 5.

B. Sufficiency of the Evidence

Rodriguez challenges the district court's denial of his motion for a judgment of

acquittal based on the insufficiency of the evidence. We review de novo a district court's denial of such a motion. *United States v. Talley*, 194 F.3d 758, 764 (6th Cir.1999), *cert. denied*, 528 U.S. 1180, 120 S.Ct. 1217, 145 L.Ed.2d 1118 (2000). In reviewing this claim, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### 1. Drug Conspiracy

■ Rodriguez contends on appeal that the evidence was sufficient to prove that he "simply had a buyer-seller relationship with Diaz only," not that he agreed to be part of a drug conspiracy moving multiple kilogram shipments of heroin and cocaine. Appellant's Br. I at 35. He also alleges that he was forced into transporting the two kilograms of heroin that were found in his possession at the time of his arrest. "To establish a drug conspiracy, the government must prove (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir.1999), *cert. denied*, 529 U.S. 1029, 120 S.Ct. 1443, 146 L.Ed.2d 330 (2000). "Proof of a formal agreement is unnecessary; a tacit or mutual understanding among the parties is sufficient to show a conspiracy." *United States v. Sanchez*, 928 F.2d 1450, 1457 (6th Cir.1991).

In this case, Rodriguez essentially contests the extent of his knowledge of the scope of the conspiracy. The evidence presented at trial, however, indicated that Rodriguez spoke frequently with Diaz about drugs and delivered at least three kilograms of heroin to Diaz in Detroit. This evidence is sufficient to support the jury's guilty verdict. *See United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir.1996) (noting that "advanced planning and multiple transactions involving large quantities of illegal drugs is also evidence that [the defendant]'s involvement was not confined to a buyer-seller relationship"); *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir.1986) (holding that "[a] large volume of narcotics" – one kilogram of cocaine in that case – "creates an inference of a conspiracy").

Rodriguez's coercion argument is also unavailing. As the Government notes, Rodriguez was part of the drug conspiracy for months before his arrest in February 1999, when he was found to be in possession of two kilograms of heroin. Therefore, a rational trier of fact could have found Rodriguez guilty of conspiracy for the time when he was not allegedly under duress.

### 2. Money Laundering Conspiracy

■ Rodriguez argues that the evidence is insufficient to support his conviction for conspiracy to launder money. In *United States v. Reed*, 77 F.3d 139 (6th Cir.) (en banc), *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), we held that the delivery of drug proceeds to another "with the intent to promote the carrying on of further drug activity" would violate 18 U.S.C. § 1956. *Id.* at 142. "[T]he mere transportation of cash," however, would not suffice. *Id.* at 143. In this case, Walter Ramirez Manasas ("Ramirez") testified that Rodriguez delivered $20,000 in drug proceeds to him to transport to New York. Once in New York, Rodriguez asked Ramirez for the money and then paid him $1,500 for the trip, which, viewing the evidence in the light most favorable to the prosecution, presumably induced Ramirez to agree to trans-

port more heroin in the future. Therefore, under *Reed,* a rational jury could have found Rodriguez guilty of conspiracy to launder money, and we hold that he was not entitled to a judgment of acquittal.

## C. Jury Instruction

■ Rodriguez argues that the district court erred in not instructing the jury about the dual roles that Saager and Grace had in testifying for the Government. In addition to serving as fact witnesses, both agents gave opinions about drug-related conversations between Rodriguez and Diaz. Because Rodriguez did not raise an objection in the case below, we review for plain error under Federal Rule of Criminal Procedure 52(b). *See United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Such a review requires us to determine whether there was "an error that is plain and that affect[s] substantial rights." *Id.* at 732, 113 S.Ct. 1770 (internal quotation marks omitted). If so, we may exercise our discretion to correct any forfeited error that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotation omitted).

In *United States v. Thomas,* 74 F.3d 676 (6th Cir.), *cert. denied,* 517 U.S. 1162, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996), we recognized "that when a police officer testifies in two different capacities in the same case, there is a significant risk that the jury will be confused by the officer's dual role." *Id.* at 682. Therefore, we recommended that juries be properly informed when an officer testified as both an expert and a fact witness. *Id.* at 683. Four years later, in *United States v. Tocco,* 200 F.3d 401 (6th Cir.2000), we held that the district court had not abused its discretion in allowing a government agent to testify as a fact and an expert witness, in part because the district court had "in-

structed the jury, both before he gave his opinion and again in the jury charge," to consider the agent's dual roles. *Id.* at 419.

Rodriguez contends (1) that the district "court was silent" about officer testimony, giving the jury "no explanation to assist in this sensitive area," and (2) that the prosecutor made "no effort" to remedy the error. Appellant's Br. I at 41, 42. The record does not support these contentions. First, the district court did distinguish between Grace's dual roles in its final charge to the jury:

> You've heard the opinion testimony of Special Agent Don Grace, a witness with special knowledge or experience, allowed to give an opinion.
>
> . . .
>
> You should consider the fact that he was also a fact witness and he participated in the investigation of this case in deciding how much of his testimony to believe or what weight to give it, if any.

J.A. at 1200. Second, the prosecutor's request at a sidebar conference to explain Grace's role was opposed by defense counsel, who wanted the appropriate instruction to be given at the end of the trial. Although defense counsel for Rodriguez stated at sentencing that he did not recall this sidebar, defense counsel for Diaz confirmed the prosecutor's account.

Because *Thomas* and *Tocco* do not appear to require more than a jury charge, we hold that the district court did not err with respect to instructing the jury about Grace's testimony. The fact that defense counsel opposed an instruction to the jury before Grace testified means that we also reject this claim under the doctrine of invited error. *United States v. Sharpe,* 996 F.2d 125, 129 (6th Cir.) (refusing to reverse on an error that a party "invited or provoked the court or the opposite party to commit" (quotation omitted)), *cert.*

*denied,* 510 U.S. 951, 114 S.Ct. 400, 126 L.Ed.2d 347 (1993).

■ The testimony of two officers, however, is at issue in this case. The district court did not instruct the jury about Saager's testimony. At oral argument, the Government acknowledged that the jury should have been so instructed. At trial, however, the prosecutor did distinguish between Saager's dual roles by explicitly relying on his knowledge and experience as a narcotics investigator when asking him about coded conversations and heroin prices. *See Thomas,* 74 F.3d at 683. We therefore hold that the absence of a jury instruction about Saager's testimony did not seriously affect the fairness or integrity of the trial.

D. Sentencing

■ Rodriguez's base offense level was initially calculated at 34 (for at least three but less than ten kilograms of heroin), then increased by two points for his role in the offense, resulting in a total offense level of 36. With a criminal history category of I, Rodriguez's sentencing range was 188 to 235 months. The district court sentenced him to 188 months. Rodriguez now argues that the district court erred in finding by a preponderance of the evidence that he was responsible for at least three kilograms of heroin and that he played an aggravating role in the conspiracy under U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3B1.1(c) (2000).

Rodriguez admits his responsibility for the two kilograms of heroin that were seized on February 5, 1999. Therefore, his only contention on appeal with respect to the additional kilogram of heroin is that the district court committed clear error in crediting "the uncorroborated assertions of Walter Ramirez, ... [an] admitted long time drug dealer who" pleaded guilty and became a witness for the Government. Appellant's Br. I at 44.

We review for clear error a district court's findings of fact at sentencing. *United States v. Charles,* 138 F.3d 257, 267 (6th Cir.1998). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 262 (quotation omitted).

Ramirez testified at trial that Rodriguez had helped him pack a suitcase containing a kilogram of heroin and then transport it to Diaz in Detroit in early December 1998. Ramirez also testified to a second trip to Detroit later that month in which he transported two kilograms of heroin for Rodriguez. Rodriguez characterizes his role in the offense as that of a courier rather than a supplier. According to Ramirez, however, Rodriguez provided the heroin and paid him for transporting the drugs. The district court expressly accepted Ramirez's testimony, finding that "Rodriguez was involved with at least three kilograms" and "that he at least played some type of a leadership role or supervisory role with respect to certain aspects of the criminal activity." J.A. at 1232–34.

We do not ordinarily review a district court's credibility determinations. *See United States v. Gessa,* 57 F.3d 493, 496 (6th Cir.1995), *cert. denied,* 516 U.S. 1098, 116 S.Ct. 827, 133 L.Ed.2d 769 (1996). Although Rodriguez questions Ramirez's credibility, we hold that the district court did not clearly err in sentencing Rodriguez. Ramirez's testimony was sufficient to support the district court's findings as to both the quantity of drugs and Rodriguez's role in the offense. *See United States v. Hough,* 276 F.3d 884, 892 (6th Cir.2002) (holding that a witness's testimony at trial, which was subject to cross-

examination, provided "sufficient indicia of reliability" for the sentencing court's determination of drug quantity).

### III. *United States v. Diaz*

#### A. Prosecutor's Exercise of Peremptory Challenges

 Diaz argues that the prosecutor "exclude[d] potential jurors on the basis of race." Appellant's Br. II at 16. We review for clear error a district court's ruling on whether the exercise of a peremptory challenge violates the Equal Protection Clause. *McCurdy v. Montgomery County,* 240 F.3d 512, 521 (6th Cir.2001).

Citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), defense counsel objected after the prosecutor excused two black jurors. The prosecutor explained that she had dismissed the first juror for "several race neutral reasons:" (1) he evidenced hostility towards the Government in answering questions about his son's mental health and confinement by the state; (2) he seemed unresponsive to or confused about some questions; and (3) "he appeared to minimize his son's involvement with marijuana" and to be "angry concerning that whole judicial process." J.A. at 438–39. The prosecutor dismissed the second juror because "he was under dressed and . . . appear[ed] cocky and at times not very attentive to the proceedings." J.A. at 439. From the record before us, it appears that defense counsel did not counter the prosecutor's explanations. The district court stated for the record that he had listened carefully to the voir dire and that the prosecutor had not discharged either juror because of his race.

The Supreme Court has established the following test for deciding whether a party's exercise of a peremptory challenge violated equal protection:

Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Diaz has not carried the burden of proving that the prosecutor purposefully discriminated on the basis of race in dismissing the two jurors. *See id.* at 768, 115 S.Ct. 1769 ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."). Indeed, nothing in the record suggests that defense counsel contested the prosecutor's explanations for the jurors' dismissal. We therefore reject Diaz's *Batson* claim.

#### B. Prosecutorial Misconduct

 Diaz challenges the district court's denial of his motion for a mistrial, which was made after the prosecutor alleged during her opening statement that Diaz had put drugs "on our streets." J.A. at 443. Defense counsel understood the prosecutor to be "referring to the community here" and characterized the phrase as "an improper appeal both to fear of crime [and the jury's] civic duty." J.A. at 443. The district court opined that "[i]t probably would have been better had the comment not been made exactly the way it was" but concluded that the comment was not "so offensive or so out of line" as to warrant a mistrial. J.A. at 444.

 We review for abuse of discretion a district court's denial of a motion for a mistrial. *United States v. Wall,* 130 F.3d

739, 745 (6th Cir.1997). "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *United States v. Carroll,* 26 F.3d 1380, 1383 (6th Cir.1994). In reviewing a claim of prosecutorial misconduct, we first determine whether the statement was improper. *United States v. Francis,* 170 F.3d 546, 549 (6th Cir.1999). To warrant the reversal of a conviction, improper statements must also be flagrant, which requires consideration of the following factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* at 549–50.

Although the prosecutor's statement may have been improper, it was not flagrant. The prosecutor simply pointed out where the defendants were alleged to have carried out their drug conspiracy. Given the extensive evidence of drug-related activity in Detroit, the single reference to "our streets" does not suggest that the jury was misled or that Diaz was prejudiced.

C. Consecutive Sentences

■ After the jury convicted Diaz of belonging to a drug and money laundering conspiracy, the district court sentenced him to imprisonment for 240 months for the former and 120 months for the latter count, with the sentences to be served consecutively. Diaz argues that the imposition of consecutive sentences constituted an abuse of discretion and "an 'end run' around *Apprendi.*" Appellant's Br. II at 25. With respect to sentencing a defendant under the Sentencing Guidelines, we review the district court's legal conclusions de novo and factual findings for clear er-

ror. *United States v. Matthews,* 278 F.3d 560, 561 (6th Cir.2002).

The Sentencing Guidelines provide as follows:

If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

U.S.S.G. § 5G1.2(d). Therefore, district courts may impose consecutive sentences of imprisonment, as long as the combined sentence is no greater than "the total punishment," which under Sentencing Guidelines commentary "is determined by the adjusted combined offense level." U.S.S.G. § 5G1.2 commentary.

Diaz's base offense level was initially calculated at 36 (for at least ten but less than thirty kilograms of heroin), then increased by two points for his role in the offense, resulting in a total offense level of 38. With a criminal history category of III, Diaz's sentencing range was 292 to 365 months. Because his combined sentence is 360 months, or less than the total punishment, the district court did not err in imposing a consecutive sentence. *Cf. United States v. Page,* 232 F.3d 536, 544 (6th Cir.2000), *cert. denied,* 532 U.S. 1056, 121 S.Ct. 2202, 149 L.Ed.2d 1032 (2001). At oral argument, defense counsel suggested that the district court was unaware of its discretion to impose concurrent sentences. We reject this argument on the basis of the record, which indicates that the district court believed consecutive sentences to be "appropriate" rather than mandatory. J.A. at 1277.

Diaz's *Apprendi* argument is similarly unavailing. In *Apprendi v. New Jersey,*

530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. In this case, the fourth superseding indictment alleged that Diaz belonged to a conspiracy moving "multi-kilogram shipments of heroin and cocaine" and specified two particular shipments of "approximately two kilograms of heroin" and "approximately 3/4ths of a kilogram of heroin." J.A. at 69–71. Under 21 U.S.C. § 841(b)(1)(A), the statutory maximum for these drug offenses is life. Moreover, the statutory maximum for a drug conspiracy involving an unspecified quantity of those drugs is 240 months; it is 360 months for "any person [who] commits such a violation after a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(C). Because Diaz was convicted in 1985 for criminal possession of a controlled substance and sentenced to four and a half to nine years in prison, his sentence in this case was not in violation of *Apprendi.*

### D. 18 U.S.C. § 201

Finally, Diaz argues that the prosecution violated 18 U.S.C. § 201(b)(3) by corruptly giving "substantial assistance bribes" to Government witnesses with the intent to influence their testimony. Appellant's Pro Per Br. at 7. Because Diaz's brief contains no allegation of corruption in this case, there is no need for us to discuss this claim.

### IV. CONCLUSION

For the foregoing reasons, we AFFIRM the defendants' convictions and sentences.