RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 24-1657

DARRICK DERNARD BELL,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cr-20183-1—Mark A. Goldsmith, District Judge.

Argued: April 30, 2026

Decided and Filed: May 7, 2026

Before: SUTTON, Chief Judge; CLAY and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** James W. Amberg, AMBERG & AMBERG, PLLC, Royal Oak, Michigan, for Appellant. Benjamin C. Coats, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** James W. Amberg, AMBERG & AMBERG, PLLC, Royal Oak, Michigan, for Appellant. Benjamin C. Coats, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge. Darrick Bell transformed a Detroit motel into the base for a drug dealing enterprise. A jury convicted Bell of three related counts of drug distribution, and the district court sentenced him to a below-guidelines sentence of 336 months. We affirm.

I.

A woman seeking treatment for a heroin overdose at a Detroit emergency room in 2016 told doctors that she was "in trouble" because "bad things [were] happening" to her. R.914 at 149. She lived in a room at the Victory Inn motel. A man named Darrick Bell supplied her with drugs and fronted her money to purchase them. To pay back her drug debts, Bell arranged for her to prostitute herself at the Victory Inn. The men she brought to the motel could then buy drugs from Bell while there. The cycle, she said, grew worse as she became more dependent on drugs supplied by Bell and his associates to feed her addiction and relied on money from the prostitution he facilitated to pay for the supply.

A police investigation prompted officers to search the Victory Inn. They uncovered evidence of a large criminal enterprise. They found several prostitutes who looked "dishevelled" (sic) along with syringes and scales in one motel room, R.923 at 132; fentanyl, heroin residue, several cell phones, and four more "dishevelled" women in another room, R.924 at 10; and 92 grams of cocaine, 17 grams of heroin, cash, and cell phones in yet a third room. Nearly every room at the Victory Inn hosted women trapped in a cycle of money for drugs and prostitution for money.

Police homed in on Bell as the ringleader. They learned that Bell rented rooms at the motel for 10 to 20 women at a time and along with several associates he used money, drugs, and violence to coerce them. He was "able to control everything that[ was] going on" because he "ma[de] all the money from the prostitution and [he] s[old] the drugs to all the girls." R.914 at 130. A two-year, national manhunt ensued, which saw Bell featured in an episode of America's Most Wanted.

Federal Marshals finally caught Bell in 2019. He went to trial on eight counts, five relating to sex trafficking and three concerning drug dealing. The trial lasted over six weeks, producing more than 3,700 pages of trial transcripts in 34 volumes. The government presented excerpts from the 14,000 hours of surveillance footage it captured of the Victory Inn, hundreds of text messages sent between cell phones discovered at the motel, and testimony from 24 witnesses. The jury found Bell guilty of three charges: conspiring to distribute drugs,

possessing drugs with the intent to distribute them, and maintaining drug-distribution premises. The jury found Bell not guilty on one sex trafficking charge and deadlocked on the other four, which the government elected to dismiss.

The three convictions generated a sentencing guidelines range of 360 months to life. The court sentenced Bell to 336 months.

II.

Bell challenges his conviction on three grounds: (1) A bevy of text messages introduced at trial as coconspirator statements amounted to inadmissible hearsay and were not properly authenticated, (2) the evidence did not support his convictions, and (3) comments by a witness about her testimony required a new trial. Each argument deserves a turn.

*Admissibility of the text messages.* At trial, the government introduced hundreds of text messages from cell phones found at the Victory Inn along with ten summaries of these conversations. Bell argues that the district court erred in letting the government present some of these messages because they contained hearsay and the government did not authenticate them.

Because the text messages contained statements introduced to prove "the truth of the matter asserted" made by people not actively testifying in court, the government needed to show why they did not amount to inadmissible hearsay. Fed. R. Evid. 801(c), 802. Statements do not constitute hearsay if a coconspirator makes them "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements by anonymous speakers are admissible under this rule so long as "circumstantial evidence" shows that the speaker and the defendant likely participated in a conspiracy. *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005). To authenticate the text messages, the government also needed to produce enough evidence "to support a finding" that the messages are what the government said they are. Fed. R. Evid. 901(a). We do not second-guess the district court's front-row assessment of these evidentiary decisions unless it abused its discretion. *United States v. Carpenter*, 157 F.4th 841, 849 (6th Cir. 2025).

Bell does not tell us which of the hundreds of text messages he believes were improperly admitted or unauthenticated. He instead protests that "many" or "most" of the texts "arguably

amounted" to hearsay or unauthenticated evidence. Appellant's Br. 25–26; Reply Br. 3. He gave the district court little more to work with, objecting generally to the large collection of messages. Courts, however, "are not like pigs, hunting for truffles buried in the record" of hundreds of text messages, which took days to present to the jury, occupy hundreds of pages of trial testimony, and whose foundation the government laid in a 230-page brief. *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (alteration adopted) (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010)); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). He has thus not shown that the district court abused its discretion in permitting the government to present the texts. *See United States v. Robinson*, 656 F. App'x 145, 149 (6th Cir. 2016); *United States v. Quintanilla*, 114 F.4th 453, 473 (5th Cir. 2024); *United States v. McClatchey*, 217 F.3d 823, 835–36 (10th Cir. 2000).

Even if Bell had developed his argument further and pointed to particular messages he found problematic, the record would belie his arguments. Ample evidence showed that members of a conspiracy that included Bell sent and received the messages. Numerous victims and former conspirators testified to the existence of a criminal enterprise to profit from a cycle of drugs and coerced sex at the Victory Inn, and several witnesses confirmed Bell's leading role in the conspiracy. That operation occupied nearly all of the rooms at the motel, which Bell rented. The conspirators sent their messages between phones that officers recovered from those rooms, which also housed drugs, drug paraphernalia, and cash. After coercing the women into prostitution through their drug addictions, Bell's drug dealers used the women to coordinate prostitution and drug sales. The messages themselves often discuss efforts to schedule these illicit exchanges. The messages readily fall into the hearsay exemption for coconspirator statements.

The government also laid a strong foundation for authenticating the messages. It presented summaries of the contents of each phone, the room where officers recovered each device, the name of the person who used each device, and the name of the person who received the messages. Many of the text conversations include messages identifying the authors. Witnesses also tied the phones to conspirators, testifying, to take an example, that one cell phone was found in a room used by one of the prostitutes working for Bell, contained photos of notes

with her name and number in her handwriting, and was logged in to her Facebook account. That is enough evidence for "a reasonable juror" to find the messages authentic. *United States v. Craig*, 953 F.3d 898, 902 (6th Cir. 2020) (quotation omitted).

Bell nevertheless says that the district court should not have admitted the messages because various residents of the Victory Inn shared the cell phones, making it hard to tell who sent each text. To admit the messages as coconspirator statements, the government did not need to attribute each message to a specific conspirator. *Martinez*, 430 F.3d at 326. The evidence, and the texts themselves, showed that the messages related to a large drug conspiracy. The presence of the phones at the Victory Inn and their use by various drug dealers and prostitutes tied to Bell showed that members of this conspiracy sent the texts. The government, in other words, "show[ed] that the unknown" author of some of those messages "was more likely than not a conspirator." *Id.* (quotation omitted).

The same holds for authentication. Witness testimony, pictures, and the messages themselves showed that they came from phones recovered at the Victory Inn or other locations occupied by members of Bell's enterprise and used by his associates. Many of the messages, moreover, named the sender. The government provided numerous avenues for the court and jury to find that the text messages are "what the [prosecution] claims [they are]." Fed. R. Evid. 901(a); *United States v. Lamm*, 5 F.4th 942, 946–48 (8th Cir. 2021).

Bell insists that, because some of the texts came from Bell's victims, they fall outside the coconspirator exemption. But nothing precludes statements by victims from qualifying under this exemption. *United States v. Clay*, 16 F.3d 892, 895 n.2 (8th Cir. 1994). "[T]he key is coordinated action," not the voluntariness or culpability of the speaker taking the actions. *United States v. Musaibli*, 42 F.4th 603, 615 (6th Cir. 2022). Because the government presented evidence that Bell's subordinate drug dealers and prostituted women sent the messages to advance the enterprise, they meet this standard. Testimony showed, for instance, that one of the victims whose messages came into the trial as coconspirator statements served as a trusted prostitute who helped run Bell's operations.

*Sufficiency and weight of the evidence.* Even if the court properly admitted the text messages, Bell claims that the evidence did not support his convictions. To succeed, Bell must show that the evidence, even when viewed in the light most favorable to the government, would not permit "*any* rational trier of fact" to find the elements of the offenses satisfied. *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015) (quotation omitted). In the alternative, Bell claims that, even if some evidence supported each element of the offenses, the convictions went against the manifest weight of that evidence. To succeed on that claim, Bell had to create "a definite and firm conviction" that the district court "committed a clear error of judgment" in rejecting this argument. *United States v. Callahan*, 801 F.3d 606, 617 (6th Cir. 2015) (quotation omitted).

The jury convicted Bell of three charges. One: he "distribute[d]," "dispense[d]," or "possess[ed] with intent to . . . distribute" illegal drugs. 21 U.S.C. § 841(a)(1). Two: he "conspire[d] to" distribute at least 280 grams of a "mixture or substance" containing "cocaine base" or 100 grams of a mixture containing heroin. *Id.* §§ 841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(B)(i), 846. Three: he "knowingly" "lease[d]," "rent[ed]," "use[d]," or "maintain[ed]" a "place . . . for the purpose of manufacturing, distributing, or using any" illicit drug. *Id.* § 856(a)(1). As to all three convictions, Bell denies that he sold drugs and that he sold the quantity of drugs the jury attributed to him.

The evidence amply supported all three convictions. Several of the victims testified to buying drugs directly from Bell. And he supplied drugs to other dealers who plied their trade at the Victory Inn. The jury had more than enough evidence to convict Bell, and the district court justifiably held that the evidence did not manifestly cut against the convictions.

The evidence likewise backed up the drug quantity finding. Recall that the charges required the jury to find Bell responsible for 280 grams of cocaine and 100 grams of heroin. *Id.* § 841(b)(1)(A)(iii), (b)(1)(B)(i). The jury could rationally assign the vast quantities of drugs discussed in witness testimony to Bell because he "was in charge of all" the "drug selling" at the motel. R.922 at 54. As "the main guy" and "the supplier for the Victory Inn," R.916 at 35, Bell undertook responsibility for the drugs distributed at the hotel.

Bell, more specifically, directly supplied one of his associated drug dealers with between three and six grams of cocaine every three or four days for four or five months. That means that Bell sold him, at a minimum, 90 grams of cocaine and possibly up to 300 grams. The three other dealers that Bell supplied would have needed to sell only 190 grams collectively to reach the 280-gram threshold. And Bell distributed $4,000 of cocaine to one of them "at least three times a day." R.916 at 37–39.

The same holds true for heroin. One of the dealers testified that heroin sold for $200 a gram and the women spent at least $100 each day on drugs. Bell's drug-and-sex web included at least 10 women at a time, which means that they needed to buy heroin for 20 days to reach 100 grams. Bell's control over the Victory Inn lasted much longer than that.

Bell's speculation that other dealers in the area might account for the volume of drugs involved gets him nowhere in view of the mountain of evidence directly connecting him to large-scale drug sales. Nor does his attack on the credibility of two witnesses who cooperated with the government—the manager of the Victory Inn and a drug dealer—meaningfully advance his position. The best assessors of the credibility of witnesses are the jurors who see and hear them testify, not the distant reviewers of pages of testimony from a cold record. Many other witnesses, at all events, corroborated the accounts of both witnesses.

*J.G.'s statements*. Bell separately seeks a new trial based on newly discovered evidence. He frames this argument as a due process challenge based on prosecutors "knowingly solicit[ing] false testimony or knowingly allow[ing] it to go uncorrected" in a way that affected the jury's decision. *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (quotation omitted).

Bell relies on emails from a defense attorney saying that a government witness named J.G. told her cellmate (his client) that she "lied" (1) "about Bell raping her" and (2) "about not knowing about the sex trafficking," which meant "Bell 'got off' as a result" from that charge. R.1032 at 2.

The problem for Bell is that J.G. never testified about either point. On the contrary, she testified that she had romantic feelings for Bell and described how Bell came to the motel only to "drop off drugs" or to manage his "prostitution" "business." R.917 at 85. J.G.'s alleged

statement to her cellmate, therefore, did not address her actual testimony at trial. The cited emails thus give no reason to believe that J.G. lied at trial, much less that her lies affected the jury's deliberations. Even if we assumed that J.G. lied in a material way, Bell fails to point to any evidence that the government "knowingly" solicited or permitted J.G.'s (allegedly) false testimony. *Mack v. Bradshaw*, 88 F.4th 1147, 1160 (6th Cir. 2023); *Glossip*, 604 U.S. at 246.

III.

Bell's challenges to the district court's sentencing guidelines calculation also fall short. In reviewing whether the district court calculated the sentencing guidelines correctly, we reconsider its factual findings only if they are clearly erroneous and approach its legal conclusions with fresh eyes. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

*Dangerous weapon enhancement.* The district court increased Bell's offense level by two because "a dangerous weapon (including a firearm) was possessed" during the conspiracy. U.S.S.G. § 2D1.1(b)(1). His accomplices' possession of a firearm counts as long as they possessed the gun "within the scope" of the conspiracy, "in furtherance" of it, and in a way "reasonably foreseeable in connection" with it. *Id.* § 1B1.3(a)(1)(B); *see United States v. Brown*, 131 F.4th 337, 344 (6th Cir. 2025).

The government cleared this hurdle. Evidence connected Bell's coconspirators to firearms and even showed that a "shootout" happened at the Victory Inn during Bell's leadership of the conspiracy. R.1141 at 40. Members of the conspiracy used the guns to support it. Two of Bell's dealers kept guns in their Victory Inn rooms along with their drug supplies. Bell tasked one of these dealers with providing the "muscle" for protecting the operation and enforcing its goals. R.917 at 94.

Bell protests innocence of any knowledge of the firearms' role in his drug operation. But he offers no evidence to support the argument. It strains credulity to believe that Bell would not "have reasonably foreseen" that the "major drug trafficker[s]" working under him "possessed weapons in the residence where [they] kept a significant drug supply and thousands of dollars in currency." *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010). Even if he were

somehow ignorant of the weapons at the hotel, Bell certainly knew about them after J.G. called him to report the shootout.

*Leadership enhancement.*  Bell challenges the district court's four-point enhancement for his role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  Considerable evidence undergirds the finding. One victim said that Bell was "the boss" of the Victory Inn drug enterprise.  R.920 at 99. Another victim said that Bell "was basically running the Victory Inn" because "[e]verything revolved around him" and that he was "able to control everything that's going on."  R.914 at 110, 130.  At least 10 women at a time fell under Bell's influence.  Bell oversaw a small army of dealers, including one who served as his "right-hand man" and helped collect the proceeds of the drug sales.  R.918 at 105–06.  Bell managed these subordinates by frequently calling meetings to discuss operations.

The record does not supply any traction for Bell's contrary arguments.  He insists that he sold drugs only to individuals rather than as a part of a larger scheme.  But the evidence at trial provides plenty of evidence of retail and wholesale sales.  It includes numerous examples where he supplied drugs through his drug dealing associates.  And it includes one example in which a dealer handled thousands of dollars of drugs at a time.

Bell's claim to being a single small-time drug dealer among many others at the Victory Inn cloaks his leadership of a brazen operation with humility.  Not only did he supply the others with their drug inventory and frequently collect profits from them, he also served as the central coordinating figure for the operation.  Rather than one among equals, Bell was "the main guy" and "the supplier for the Victory Inn."  R.916 at 35.

*Drug quantity finding.*  Bell attacks the district court's decision to increase his offense level by two points because he was responsible for at least 3,000 kilograms of "converted drug weight."  U.S.S.G. § 2D1.1(c)(4).  In this calculation, one gram of crack cocaine base counts as 3.5 kilograms of "converted drug weight," and one gram of heroin adds a kilogram to Bell's drug weight total.  *Id.* § 2D1.1 cmt. n.8(D).

The record shows that Bell sold far more than the required quantity. A single one of the dealers he supplied alone exceeded it in a four-month period. The dealer sold between 2 and 4.5 ounces of cocaine base at least every four days. That comes out to at least 1,729 grams of cocaine sold over that period. That quantity counts as over 6,000 kilograms of converted drug weight, double the quantity required. *Id.* § 2D1.1(c)(4) & cmt. n.8(D). Given the overwhelming evidence that Bell was the main supplier for all of the dealers at the Victory Inn for a much longer period than four months, we find no error, let alone the requisite clear error, in the district court's calculations.

*Threat of violence enhancement.* Bell denies that he "used violence, made a credible threat to use violence, or directed the use of violence," *id.* § 2D1.1(b)(2), undermining the district court's two-point enhancement on that ground. The evidence clearly supported the finding. Bell used or threatened violence to protect his drug operation or collect debts. He told one of the female victims who was delinquent in paying back drug money he fronted her: "Don't make me beat your ass, get my money." R.914 at 131–32. He broke another of the victims' toes with a baseball bat after she "stole his drugs." R.917 at 141–42. Violence pervaded the enterprise until the government ended it.

Resisting this conclusion, Bell says that the evidence connected violence only to the sex trafficking charges, for which the jury acquitted him or deadlocked, not to the drug convictions, for which the jury convicted him. But this contention overlooks the tight web of interconnections between Bell's drug dealing and the prostitution at the Victory Inn. No less importantly, it overlooks the significant evidence that Bell and his subordinates used "physical assaults" to enforce drug debts. R.917 at 41–42. In trying to parry these arguments, Bell returns to the theme of questioning the witnesses' credibility. But we typically do not second-guess the district court's credibility determinations at sentencing. *United States v. Rodriguez*, 38 F. App'x 244, 252 (6th Cir. 2002). And, again, he provides no sound reason to doubt the district court's face-to-face assessment of their testimony or of the testimony of other witnesses who corroborated it.

*Criminal history points.* Bell challenges the district court's assignment of 12 criminal history points for his numerous prior Michigan convictions. Bell insists that only his 1995

conviction for second-degree murder should count because he finished his other sentences before the beginning of the Sentencing Guidelines' 15-year lookback window. We need not resolve the point. Bell has agreed all along that his criminal history fell into at least category III. Appellant's Br. 43 ("If they had not been scored, Bell's criminal history level would have been reduced to 4 points."); Reply Br. 8 ("[I]t was error to assign him 12 additional points."); R.1053 at 11 ("[H]is criminal history score is a 4, which places him as a category III criminal history."); Oral Argument at 9:02–9:17 (admitting Bell had at least four criminal history points). Because the district court correctly calculated Bell's offense level, his sentencing range of 360 months to life in prison would not change regardless of whether his criminal history fits within category III or VI. *See* U.S.S.G. ch. 5, pt. A (2023) (sentencing table). If a guidelines disagreement has no impact on the resulting range, we need not resolve it. *See United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019); *see also United States v. Daniels*, 163 F.4th 992, 1015–16 (6th Cir. 2026).

Even if Bell made it to the base of this issue, it's worth pointing out that he would face a steep ascent to reach the summit. He incurred four Michigan sentences for assault, illicit concealed weapons, and drugs between 1990 and 1993. He is right that the Sentencing Guidelines consider only convictions that happened during the last 15 years or that caused the defendant to be in prison during the last 15 years, U.S.S.G. § 4A1.2(e)(1), and that individually each of these sentences was originally scheduled to end before that 15-year lookback period began in 2000. But we "normally" consider a conviction for criminal history purposes if some "incarceration during the lookback period . . . would not have occurred in the absence of—that is, but for—the sentence." *United States v. Hinojosa*, 138 F.4th 1004, 1008 (6th Cir. 2025) (quotation omitted). And Michigan law made him ineligible for credit for time served during presentence custody on his murder conviction because he remained on parole for these offenses. *See* Mich. Comp. Laws § 769.11b; *People v. Idziak*, 773 N.W.2d 616, 624 (Mich. 2009). These convictions, then, likely served as a "but for" cause of prison time that he served during the relevant 15-year period. *Hinojosa*, 138 F.4th at 1009.

We affirm.